# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.  06-0018 (RBW)** |
| | : | |
| v. | : | |
| | : | |
| **LARRY M. BRUNI,** | : | |
| **Defendant.** | : | |

**FILED**

MAR  6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## STATEMENT OF THE OFFENSE

Pursuant to Fed. R. Cr. P. 11, defendant Larry M. Bruni agrees and stipulates as follows:

Medicare is a "health care benefit program" as defined in 18 U.S.C. Section 24(b) because it is a public plan or contract, affecting commerce under which medical benefits, items, and services are provided to individuals.  Medicare reimburses health care institutions and professionals such as physicians.  Part A of Medicare provides reimbursement for hospital stays and similar related medical services.  Part B of Medicare provides payment for doctors' services, outpatient hospital services,  medical equipment and supplies, and other services.  The Medicare program is primarily funded through appropriations from the United States Treasury, and is administered by the Centers for Medicare and Medicaid Services ("CMS").

At the end of 2000, Medicare received a Provider Enrollment Application dated November 30, 2000 from Dr. Bruni.  In this application, Dr. Bruni agreed to adhere to the applicable laws relating to the Medicare program, including laws requiring providers to bill only for services provided and to retain and provide medical records to Medicare, if requested.  CMS assigned Dr. Bruni a unique personal identification number ("PIN"), to be used for billing purposes.  Thus, during the relevant period, October 2001 to March 2003 ("relevant period"), Larry M. Bruni was a Medicare health care provider.

During the relevant period, two other people, in varying degrees, assisted Dr. Bruni in his medical practice. One person ("other person"), for example, had signatory authority on various bank accounts in the name of Larry M. Bruni, M.D.; these medical practice business bank accounts received many, if not most, of the Medicare checks and paid for the personal living expenses of Dr. Bruni and the other person, and the expenses of the medical practice. This other person was primarily responsible for the financial and accounting duties of the medical practice, including billing Medicare. Dr. Bruni primarily focused on treating patients and recording progress notes in patient files, both electronically and in hard copy.

Dr. Bruni and the other person were assisted in office duties by others, including someone identified here at Person A. Person A assisted the medical practice by, among other things, trying to collect claims which were denied. Person A was responsible for follow-up on collections and was paid a percentage of the checks.

During the relevant period, others billed Medicare using Dr. Bruni's name and PIN, for services involving Reteplase injections. Dr. Bruni never administered Reteplase injections to any patient. Reteplase is a drug that is ordinarily given to patients with acute myocardial infarction (commonly referred to as a "heart attack") in the Emergency Room and is typically a one-time application. The patients are usually admitted to the hospital, in a emergency room, so the charges are typically submitted to Part A of Medicare (that part which is responsible for reimbursing hospitals). Reteplase is generally given within the first three hours of a patient experiencing heart attack symptoms. It is used as First Aid for a cardiac arrest, as it is a blood thinner and a clot breaker. Medical literature also recognizes an "off label" use for Reteplase, that being to clear intravenous tubes into a patient, such as a central line.

Claims for Dr. Bruni's services of Reteplase injections involved two patients - for one, Dr. Bruni allegedly injected Reteplase three times; for the other patient (Person A), Dr. Bruni allegedly injected Reteplase 185 times. On some days, Dr. Bruni allegedly injected Reteplase multiple times. For example, bills to Medicare claimed that Dr. Bruni injected Person A with four Reteplase injections on October 10, 2002, four Reteplase injections on October 11, 2002, four Reteplase injections on October 12, 2002, three Reteplase injections on October 13, 2002, and one Reteplase injection on October 14, 2002. All of the claims to Medicare using Dr. Bruni's name and PIN listed the location of the service as "home."

The claims submitted in Dr. Bruni's name charged Medicare for approximately $520,000 for the 188 Reteplase injections. If allowed, Medicare would have paid 80%, or approximately $423,800. However, Medicare did not allow all of the claims. Of these 188 Reteplase injection claims, Medicare denied payment for 68 and paid about 119. Medicare paid $154,832 for the Reteplase injections, services which were never provided by Dr. Bruni. These Medicare checks were made payable to Larry M. Bruni, M.D., and all but one were deposited into bank accounts under the account name of, "Larry M. Bruni, M.D." 90% of the money Medicare paid to Dr. Bruni during the relevant time period was for either non-existent Reteplase injections or non-existent services to Person A.

During the relevant period in which Medicare paid for the Reteplase claims, the bank accounts were used to pay personal expenses of Dr. Bruni and the other person, and to pay the expenses for the medical practice. For example, the Medicare payments allowed Dr. Bruni and the other person to pay the rent on their home and business, to pay utilities, medical bills, and to pay for other personal items. During the latter part of this same period, Dr. Bruni treated fewer

3

patients. Dr. Bruni and the other person, on some occasions, could not make timely payment for their personal expenses and expenses of the medical practice. Because of the Medicare money for the non-existent Reteplase injections, Dr. Bruni and the other person, during the relevant time period, were able to pay many bills.

Dr. Bruni knew that the income from his medical practice from services actually rendered was insufficient to pay all of the personal and medical practice expenses which were timely paid, or paid late. Dr. Bruni knew that he was accruing expenses greater than his income from services actually rendered. According to Dr. Bruni, Person A told Dr. Bruni that the medical office was expecting, and would receive, a check from Medicare for a large amount of money, and Dr. Bruni expected this check to be deposited into his medical practice bank account.

Dr. Bruni knew of the high probability that his expenses were paid from funds for services not actually performed but billed to Medicare. Yet, he consciously choose not to investigate or ask the other person or anyone else in his office to explain and document the source of the funds which allowed his personal and business bills to be paid. Dr. Bruni consciously ignored the insufficiency of the income to pay expenses, and the reference to the

4

large Medicare check for the purpose of avoiding learning the true source of the funds deposited

into the bank accounts.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
for the District of Columbia

By:    _V Cheatham_____

VIRGINIA CHEATHAM
Assistant U.S. Attorney
Bar No. 411980
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-9732

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after
consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under
penalty of perjury that it is true and correct.

Date: _24 Feb 2006_           _____

Larry M. Bruni
Defendant

I concur with his decision to stipulate to this Statement of Offense.

Date: _9/24/06_               _____

Michael L. Fayad, Esq.
Attorney for the Defendant

5