UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No.: 06-0018 (RBW) |
| LARRY M. BRUNI, : | |
| : | |
| Defendant. : | |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing regarding the defendant, Larry M. Bruni.

I. BACKGROUND

On March 6, 2006, the defendant pleaded guilty to a one count Information charging Health Care Fraud, 18 U.S.C. Section 1347. At the time of the offense, the defendant was a practicing physician and a Medicare health care provider. The defendant's name and unique Medicare number were used to fraudulently billed Medicare for approximately $520,000 for services involving Reteplase injections. The defendant, however, never administered Reteplase injections to any patient. Medicare ultimately paid $154,832 for services which the defendant never actually provided. The majority of the $154,832 of Medicare checks were deposited into bank accounts under the account name of, "Larry M. Bruni, M.D." The defendant and his long-time companion used the fraudulently obtained money to pay for their own personal expenses and to pay the bills of the medical practice. Ninety percent of the money Medicare paid to the defendant during the Reteplase injection bills' time period was for either non-existent Reteplase injections or non-existent services to one of the patients who allegedly received the Reteplase injections.

In this region, claims for payments submitted by doctors to Medicare are processed by a Medicare contractor known as TriCenturion. Pursuant to federal regulations, TriCenturion employs fraud investigators who research suspect billings. Because Reteplase is a emergency, first-aid, heart medicine used in hospitals' emergency rooms as a clot breaker during heart attacks, TriCenturion became suspicious of the defendant's claims that he administrated the drug repeatedly to two patients in a home setting. In June 2003, TriCenturion requested that the defendant provide medical records substantiating the medical bills to Medicare.[1] Representatives of TriCenturion sent letters to the defendant at the address listed on his Medicare enrollment application and attempted to contact him by telephone multiple times. On July 11, 2003, investigators from TriCenturion visited the site listed on the enrollment application as office location. A receptionist informed the TriCenturion investigators that the defendant had not been at that office address in five months. Later on the same day, the TriCenturion investigators visited an address on Pennsylvania Avenue, S.E., as this address was associated with a telephone number from his enrollment application. There, TriCenturion found a retail shop with no apartment or office space above the location. Later, TriCenturion referred the matter to the Office of Inspector General, Department of Health and Human Services. Agent Tracy McFadden was assigned the case.

On or about January 12, 2005, Agent McFadden contacted the defendant regarding the bills submitted to Medicare for Reteplase injections and the existence of supporting medical records. The

---

[1] Medicare providers are required to create and maintain medical records of billed services and to produce such records at the request of the Medicare contractors such as TriCenturion or the Inspector General of the Department of Health and Human Services. Indeed, a medical provider may be excluded from the Medicare program if he does not grant immediate access or fails to supply information to determine whether the payments were due. Social Security Act Section 1128(b), 42 U.S.C. Section 1320a-7(b)(11).

defendant told Agent McFadden that he no longer practiced medicine and that before leaving the Washington, D.C. area he made arrangements to have all of his patient files transferred to the medical office of another physician. In January 2005, Agent McFadden contacted this other doctor who confirmed that the defendant transferred approximately fifteen patients (and accompanying patient files). However, the doctor reported that files for the patients who allegedly received the Reteplase injections were not among those transferred files.

In July 2005, Agent McFadden again contacted the defendant regarding the location of the medical records for the Reteplase patients. The defendant again told Agent McFadden that the files were with the other physician, and that he transferred all (numbering approximately 1600) of his medial records to this doctor. Agent McFadden told the defendant that the other doctor denied receiving the Reteplase patient files. The defendant volunteered that he also maintained copies of his patient records on his computer, explaining that whenever he would see a patient he would document the visit electronically and print out a paper copy for the file. He said that there would be a copy of the medical record on his computer and that this computer was currently in his possession in Albany, New, York. The defendant stated that he has been trying to retrieve the records from his computer but he had been unsuccessful, as his computer was not working and he had not the money to hire someone to repair it.

The agent and, later, the undersigned Assistant U.S. Attorney attempted to obtain the computer from the defendant and, then, when the defendant hired an attorney, from the attorney; all attempts were unsuccessful. Thereafter, the government sought and received court authority to search the defendant's home for the computer. On July 28, 2005, Agent McFadden, along with other law enforcement personnel, executed a search warrant seeking the computer and other evidence of fraud

relating to the Reteplase injections. On that day, at the defendant's house which he shared with his mother, Agent McFadden knocked and announced her reason for being there. A woman identifying herself as the defendant's mother came to the door and admitted the agents, explaining that the defendant lived in the basement of the house. As the agents approached the basement door, the defendant's mother opened the door and advised the agents that two dogs were in the basement with the defendant. Then, the defendant approached the stairwell with his two dogs. Both dogs appeared to be full-grown afghan hounds. Standing on four legs, the dogs reached about three feet, that is, to Agent McFadden's waist. Agent McFadden advised the defendant to put the dogs away. The defendant responded that in order for him to put the dogs away, the agents must leave the basement. Special Agent McFadden replied that they were not leaving and that the defendant needed to put the dogs away.

At this time, the defendant commanded the dogs, saying "sick them - bite them." The dogs began to run towards Agent McFadden. Immediately, Agent McFadden drew her weapon, but did not fire; instead she, again, told the defendant to get the dogs. Only then, did the defendant comply with Agent McFadden's commands and put the dogs away.

The defendant then showed the agents the location of the computer, or rather, the hard drive which had been taken out of the enclosing unit. The defendant identified this hard drive as the one containing the sought-after medical files. After its seizure, Agent McFadden submitted this hard drive to a forensic computer expert. The forensic computer specialist concluded that "the hard drive controller board [had] five missing integrated circuit chips and one torn circuit trace." The expert opined that "this damage was caused by someone deliberately trying to destroy the drive and/or the data on the drive." See Forensic Examination Report, attached as Exhibit A.

## II. SENTENCING ANALYSIS

In the plea agreement, the defendant and the government agreed that the offense level based upon the stipulated facts totaled 16.  See U.S.S.G. § 2B1.1 (base offense level 6 increased by 10 due to loss of more than $120,000 but less than $200,000).[2]  The parties also agreed that defendant was entitled to a two level reduction for having a mitigating role in the offense and another two level reduction for acceptance of responsibility, reducing his offense level to 12.[3]  Based upon a criminal history category I, defendant faces a range of 10 to 16 months in Zone C.

## III. CONCLUSION

In determining the appropriate sentence, the Court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law . . . to provide just punishment for the offense. . . to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(A) - ( C).  As is apparent from the Presentence Investigative Report ("PSR"), Dr. Larry M. Bruni is a proud man.  He reports that he is fluent in three languages and has some proficiency in five others.  He is a trained medical doctor; he reported to the probation officer that he "holds memberships in a multitude of professional organizations. . . and has an extensive litany of professional experience."  PSR at ¶76. According to the Probation Officer, the defendant stated that he will "seek to regain the

---

[2] Ordinarily, the government argues that intended loss is the correct method of calculating loss. However, in this case the government's proof of the defendant's knowledge of the fraud is based on checks received by the defendant rather than bills submitted by the defendant; therefore, the government contends that the loss should be measured by actual loss, that is, $154,832.

[3] The government mistakenly cited the 2004 version of the Federal Sentencing Guidelines in the January 2006 plea letter.  The correct version should be the guidelines in effect at the time of the sentencing (2005 version), unless the version in effect at the time of the offense of conviction is more advantageous to the defendant.  U.S.S.G. 1B1.11.

right to practice medicine" upon completion of his sentence (PSR ¶79), although the defense attorney has said that this plan "remains to be determined." Letter dated May 4, 2006 to Probation Officer Renee L. Moses-Gregory from Michael L. Fayad, Esq. ("Defense letter to probation").

The government also requests that the Court order the defendant to undergo periodic drug testing with Pretrial Services Agency.[4] According to the defendant, he takes a myriad of drugs for various ailments (see PSR at ¶59); he lists Hydrocodone, but not Hydromorphone (Dilaudid). However, in a drug test conducted by the Probation Office, the defendant tested positive for Hydromorphone (as well as Hydrocodone). The defense attorney attempted to explain this result by saying that "it is possible that once consumed, hydrocodone is metabolized to become hydromorphone." Defense letter to probation at 4. This is not possible. While both Hydrocodone and Hydromorphone are pain killers, Hydrocodone is a natural drug and Hydromorphone is a synthetic drug. Hydrocodone originates from the poppy seed, which is a natural drug. Hydrocodone is also a derivative of morphine. Hydromorphone, however, does not have a natural base as it is totally manufactured.[5] The two drug structures and manufacturing processes are very different. Given that the defendant fails to mention how he obtained the Hydromorphone (a Schedule II narcotic) and the purpose for his taking the drug, there is a need for continued drug testing.

---

[4]Periodic drug testing was not part of the Court's original release conditions.

[5]Hydromorphone is also used with heroin addicts to assist with the withdrawal symptoms from being addicted to heroin.

In light of the seriousness of the fraud and the defendant's conduct during the investigation of the offense, the government respectfully requests the Court to impose a significant period of incarceration within the guideline range of 10 - 16 months.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
for the District of Columbia

By: _____
VIRGINIA CHEATHAM
Assistant United States Attorney
D.C. Bar # 411980
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-9732

CERTIFICATE OF SERVICE

I hereby certify that on May \_\_\_, 2006, a copy of the foregoing memorandum has been sent via first class mail to the counsel for the defendant, Michael L. Fayad, Esq., Greenberg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006 and to Probation Officer Renee L. Moses-Gregory.

_____
VIRGINIA CHEATHAM
Assistant United States Attorney