## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Criminal No. <u>06-0018 (RBW)</u>** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **LARRY M. BRUNI,** | **:** | |
| **Defendant.** | **:** | |

### <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

The Defendant, Larry M. Bruni, by the undersigned counsel, submits this Memorandum In Aid of Sentencing in accordance with the General Order Governing Criminal Cases, page 18, Section (9) Sentencing.

In this Memorandum In Aid Of Sentencing, Defendant Larry M. Bruni, by counsel, requests that this Court "tailor" a sentence including the following elements: 1) a term of probation; 2) conditions requiring treatment for defendant's physical and emotional disorders; 3) participation in Defendant's current treatment program at the Four Winds Hospital, Saratogam NY; 4) participation in such other programs as the Court and Probation Office may deem appropriate; 5) monthly reports to the Probation Office regarding the status and progress of treatment, and any failure to follow the recommended treatment program; 6) an employment or public service undertaking as soon as possible consistent with the advice of Defendant's physicians and the sentence to be imposed by this Court. In order to tailor this sentence in accordance with the statutory and case authority applicable in this Circuit, the court should adopt the guideline range agreed to in the Plea Agreement and grant a downward departure of 5 levels. As grounds for this proposed sentence, Defendant provides the following information.

## I. BACKGROUND

Medicare is a federally-funded medical insurance program which reimburses carriers for medical care to the elderly and certain disabled persons. The United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program. Part A of the Medicare program manages hospital insurance and Part B manages non-hospital insurance. Medicare uses Trailblazer Health Enterprises, LLC ("Trailblazer") to administer its Part B program. CMS contracted with TriCenturion, LLC ("TriCenturion") to handle Medicare integrity and fraud issues.

## II. PROCEDURAL HISTORY

TriCenturion began investigating Dr. Larry M. Bruni's[1] billing practices after Trailblazer Health Enterprises identified him in a study of excess billing for Reteplase injections. After they were unable to contact Mr. Bruni through the mail and by phone, TriCenturion representatives attempted to visit him in person in July 2003. The representatives could not locate Mr. Bruni's office address as they were unaware that Mr. Bruni had moved his office to his home in 2002. TriCenturion investigators next visited his home address at 503 Groff Court, N.E., Washington, D.C. on July 11, 2003. They did not find him there although two other individuals were present. The representatives attempted to contact Mr. Bruni by phone on July 24, 2003. They spoke with an individual who told them that Mr. Bruni was ill and did not know when he would be returning.

---

[1] At the time of the plea entry, Mr. Bruni's D.C. license had expired and following the plea entry, he notified the Virginia Board of Medicine of the entry of guilty.

The Government did not make any further attempts to contact Mr. Bruni again until January 12, 2005, when Special Agent Tracy McFadden ("S.A . McFadden") with the Department of Health and Human Services, Office of Inspector General, contacted Mr. Bruni by phone, where he was staying in the basement of his mother's home in Albany, NY. to inquire about the Reteplase injections.  Mr. Bruni told S. A. McFadden that he did not recall administering the Reteplase injections and that his patient files had been transferred to another doctor's medical office.  Around January 13, 2005, S. A. McFadden contacted the other doctor who told her that approximately fifteen of Mr. Bruni's patient files had been transferred to him.

The Department of Justice issued subpoenas to the Bank of America and First Union/Wachovia Bank requesting Mr. Bruni's bank records on January 28, 2005.  The United States Attorney's office issued a letter to Mr. Bruni dated January 28, 2005, informing him that the subpoenas had been issued and that he was being investigated for false insurance claims.

Approximately six months following the initial phone call to Mr. Bruni, on July 12, 13, and 14, 2005, S. A. McFadden contacted and talked to Mr. Bruni by telephone regarding the location of his patient records.

Around July 15, 2005, Mr. Bruni retained Lowell Siegel, Esquire, based in Albany, NY, to represent him in matters relating to the investigation.  On July 26, 2005, Mr. Siegel spoke with Assistant United States Attorney ("AUSA") Virginia Cheatham regarding scheduling a meeting in early August at the United States Attorney's Office in Washington, D.C.

On July 27, 2005, Agent McFadden obtained a search warrant for the basement of Mr. Bruni's mother's home at 370 Partridge Street, Albany, NY 12206, from the United States District Court for the Northern District of New York. The search was carried out by HHS agents with the assistance of the Albany police on the morning of July 28, 2005. The Government did not inform Mr. Bruni's attorney, Mr. Siegel, of the search beforehand and carried out the search after a meeting had been scheduled between the AUSA and Mr. Siegal.

In the period that followed Mr. Siegel's Washington, D.C. meeting at the United States Attorney's Office, Mr. Bruni considered engaging other counsel in order to determine and implement the appropriate strategy for his situation. In September 2005, Mr. Bruni retained the law firm of Greenberg Traurig, LLP to represent him in this matter. On October 12, 2005, Michael Fayad, Esquire, of Greenberg Traurig met with AUSA Cheatham and Special Agent McFadden regarding the investigation of Mr. Bruni. In November 2005, Mr. Bruni agreed to an immunized proffer in order to try to convince the Government that he could provide "substantial assistance" to the Government in determining the persons actually responsible for devising the fraudulent scheme, and who actually carried it out.

The proffer took place on January 6, 2006, with AUSA Virginia Cheatham and Special Agent McFadden. During this meeting Mr. Bruni provided complete, candid and truthful information over a period of about three hours. In addition, since the patient billing records were very important in determining the level of participation of the three individuals in the investigation of the false Medicare billing, Mr. Bruni provided significant cooperation by turning over to the Government a hard-drive, and offering to

give the Government a list of folders which were on the hard-drive. The hard-drive had

been forensically preserved, and the folder list had been created by a forensic data

analyst. The Government rejected Mr. Bruni's cooperation, but offered a plea

agreement.[2]

Mr. Bruni accepted this agreement and pled guilty to health care fraud pursuant to

18 U.S.C. § 1347 on March 6, 2006, before the Honorable Reggie Walton, United States

District Court, District of Columbia. Mr. Bruni's guilty plea was based on a deliberate

ignorance theory.

## III. STATEMENT OF FACTS

### A. Mr. Bruni's Medical Career

Mr. Bruni began his solo practice in 1988 and primarily focused on diagnosing

and treating patients with AIDS and HIV. Mr. Bruni had a widespread, and at times

controversial, reputation for treating the infections aggressively; he was consistently

ahead of the mainstream in his approach and treatment of the disease. (See, e.g. Ex. B.)

For example, he began prescribing AZT in 1987 before it was official approved by

enrolling his patients in a study which allowed use of the drug prior to FDA approval. He

was by far the only doctor in the District of Columbia with the largest number of patients

enrolled in the study. A few years later, Mr. Bruni began administering the drug IL-2 in

his treatment of AIDS. The National Institute of Health began using IL-2 in 1993.

---

[2] While the manner and extent of the conduct of a criminal investigation is within the purview of the Government, Mr. Bruni provided the Government with the precise means they had been seeking: medical and billing records, in order to determine which of three obvious persons were responsible for the fraudulent scheme and the relative roles of those three individuals. The Government decided not to use Mr. Bruni's assistance nor his information, and decided not to investigate or prosecute the other two individuals. One of them has never been interviewed. So, the actual "perpetrators" remain at-large. Nevertheless, Mr. Bruni has stepped-up, and admitted every sad detail of his role, and has given the Government the means to prevent the real criminals from perpetrating the same scheme again. It appears, in their judgment, which is not for Mr. Bruni to question, justice, at some attenuated level, has been done.

Finally, Mr. Bruni began using combination antiviral drug regimes, in which the various drugs are rotated, years before this became the standard procedure in the United States.

Around the late '80s and early '90s, Mr. Bruni was also heavily involved in the National Community Research Initiative, a non-profit organization which focused on developing clinical software that would enable doctors to collect and share HIV/AIDS data in a standard form. Mr. Bruni's interest and use of information technology in the medical field has been constant throughout his career. For example, he was involved in developing a software program, MEDSYS, for use in his own practice. The program processed the patients' lab reports, medical history, medications list, progress notes, etc. He also began a correspondence certificate program in Medical Informatics at Oregon Health & Science University[3] and completed three courses in the program before his health problems prevented him from continuing the program.

### B. Mr. Bruni's Health Problems

Mr. Bruni is HIV-positive, and suffers from the following physical and mental conditions: deep venous thrombosis, for which he takes a blood thinner, severe chronic pain, major depression and anxiety disorder.

Mr. Bruni underwent surgery in June 2000 for a herniated disk at L5-S1. The surgery left a dural tear and spinal fluid leaked. Consequently, Mr. Bruni went to the emergency room on July 4, 2000, and a second surgery was performed to repair the tear. This surgery was unsuccessful. After the second surgery, Mr. Bruni's back pain gradually increased until, in December 2000, it reached the level he experienced before his second surgery. He was diagnosed with Failed Back Surgery Syndrome resulting in Chronic Pain Syndrome.

---

[3] The program teaches and trains participants in applying information technology to the health care field.

Mr. Bruni has seen several doctors, including pain specialists, to treat his chronic severe pain. Since 2000, Mr. Bruni's doctors have prescribed several different pain medications at different times in an effort to find a treatment that would control his pain while minimizing the side effects that severely interfere with his quality of life and ability to function. The pain medications he has taken most consistently are Oxycontin, Neurontin and Methadone. Other pain medications taken include Morphine, MS Contin, Percocet, Hydrocodone, Roxicet tabs, Lortab, Duregestic (Fentanyl), Depakote, Trileptal and Carbamazepine.

Mr. Bruni took Oxycontin regularly from approximately May through June 2000 and June 2001 through October 2001. While on Oxycontin, Mr. Bruni experienced severe sleepiness as a side-effect. He would at times fall asleep while standing. In October 2001, at Mr. Bruni's initiation, and with his doctor's advise, he stopped taking Oxycontin for pain treatment and switched to Methadone, which he has been using since that time, to control his pain. Mr. Bruni also took Neurontin for pain treatment from approximately February 2001 to at least October 2003. Sleepiness and difficulty in concentrating are also side-effects Mr. Bruni experienced from the Methadone. To counteract the sedating effects of the pain medications, Mr. Bruni's doctors prescribed stimulants. For example, at various points during the relevant period, Mr. Bruni was prescribed modafinil, dextroamphetamine and methylphenidate.

In addition, Mr. Bruni started experiencing symptoms of a jaw infection in November 2002. He underwent four surgeries for the infection during January - March 2003. As a result, he was required to take antibiotics with significant side-effects such as

severe diarrhea.  His methadone dosage also increased as a result of the additional pain

from the jaw infection and surgeries.

Mr. Bruni suffers from severe depression and anxiety disorder.[4]  During the

relevant period, he was prescribed Celexa (citalopram hydrobromide), Wellbutrin

(bupropion hydrochloride), Zyphrexa, Effexor, and Xanex at various points.   He also

took Ambien during the relevant period to combat insomnia.

### C.  The Offense

During the relevant period, October 2001 to March 2003, Mr. Bruni was a

Medicare health care provider.  Since approximately 1975, Mr. Bruni,  a homosexual, had

a "partner" with whom he had a continuous relationship, and with whom he was living,

Mr. Gary Whaley, the "other person" referred to in the Information and Statement of

Offense.  Mr. Whaley was responsible for all of the financial aspects of their personal

life, such as paying bills, tracking bank accounts and credit cards and, up to a point,

preparing and submitting tax returns.

Not long after completing his residence, Mr. Bruni's took a position in a

Washington D. C. medical practice in 1986, where he took-up the treatment of serious

infectious diseases, and many patients were wealthy homosexuals with either AIDS,  or

who were HIV-infected.  Mr. Bruni continued working with working with AIDS or HIV-

infected patients in a second practice in Washington D.C. until approximately September,

1988, when he opened his own practice at 1145 19th Street, Washington, D.C.  Later, Mr.

Bruni moved his practice  to 801 Pennsylvania Avenue, S. E., from 1991 to 1995, then to

---

[4] Mr. Bruni is currently participating in an Intensive Outpatient Program, at Four Winds (Psychiatric) Hospital, Saratoga Springs, NY for treatment of his psychological disorders.

a storefront at 631 Pennsylvania Avenue, S.E., then, ultimately to their rented house at 503 Groff Court, S.E., Washington D.C.

From 1988 to 1994, Mr. Bruni enjoyed great success as an outspoken advocate for more aggressive treatment of both AIDS and HIV-infected patients. Most importantly, he actively promoted a more uniform and effective national collection, analysis and dissemination of data about AIDS and HIV-infected cases.

While Mr. Bruni was practicing with the other doctors, he began treating Raymond Chesnick on a regular basis. Mr. Chesnick is referred to as "Person A" in the Information and Statement of Offense. Mr. Chesnick had worked as an administrative assistant for a senior member of a D.C. law firm, but appeared to have no job and was receiving Federal medical disability payments. Eventually, Mr. Chesnick attached himself to Messrs. Bruni and Whaley, and, in large part, lived-off Mr. Bruni's income and parked himself for long periods at the Bruni office or home.

Mr. Whaley played a dominant role in Dr. Bruni's decision to open his own practice. From September 1988 until Mr. Bruni closed the practice, Mr. Whaley oversaw the financial and administrative activities for the practice, including the creation of billing records and the transmittal of the bills to the financial intermediary for payment. Mr. Bruni's role, in contrast, was for the most part limited to treating patients and entering progress notes for the patient files. For example, Mr. Whaley had signature authority over bank accounts in the name of Larry M. Bruni, MD. In addition, the records from October 1997 through January 2003, for the First National Bank of Omaha bank account in the name of Larry M. Bruni, MD indicate that during this entire period, Mr. Bruni

signed only two checks from this account, both payable to his dental surgeon, Charles Lindquist. Mr. Whaley signed the rest of the checks, at least 130.

Mr. Chesnick also played an increasingly dominant role in the Bruni practice and the household of Messrs. Bruni and Whaley. Mr. Chesnick assumed part of Mr. Whaley's responsibilities, including administrative and billing matters for Mr. Bruni's medical practice. In particular, Mr. Chesnick was very adept at collecting rejected or delayed claims submitted to Medicare or other insurance companies. If successful, Mr. Chesnick received a percentage of the payment.

During the relevant period, other people used Mr. Bruni's name and PIN to fraudently bill Medicare for Reteplase injections which were never administered. Reteplase is a drug used to treat patients suffering from a heart attack. It is normally administered in an Emergency Room setting within the first three hours of heart attack symptoms. Reteplase also has an "off label" use of clearing intravenous tubes.

Claims were submitted for three Reteplase injections allegedly administered to one patient and 185 injections to Person A, Mr. Chesnick. Medicare paid for 119 of the claimed Reteplase injections and denied claims for 68 of the injections. Some of the claims were for multiple Reteplase injections given to Mr. Chesnick on the same day. For example, a Medicare claim form dated February 28, 2003 sought reimbursement for four Reteplase injections allegedly administered on October 10, 2002, four injections on October 11, four on October 12, three on October 13, one on October 14, and four on October 20, 2002. Medicare paid a total of $154,832 for the 119 claims through checks payable to Larry M. Bruni, M.D. Mr. Bruni did not sign any of the six Medicare checks which reimbursed for the Reteplase billings.

At one point during the relevant period, Mr. Chesnick told Mr. Bruni that the office was expecting a large Medicare check and he (Mr. Chesnick) wanted to make sure he received his share of it.  Mr. Bruni later learned from the Mr. Whaley that they had received $60,000, but that the entire amount had been spent.  Mr. Bruni recognized the peculiarity of receiving such a large amount when his workload had been significantly reduced and suspected that illegal billing was occurring.

During this period Mr. Bruni suffered from psychological disorders, was taking several medications, including narcotics, for chronic pain and psychological problems, and was experiencing professional, economic and personal and difficulties, including the gradual breakup and dissolution of his household and long-term relationship with the Mr. Whaley.  These factors played a role in the offense but did not prevent him from conforming his conduct to the law or recognizing right from wrong.  Mr. Bruni knew that the income he was receiving for the medical services he performed was inadequate to cover the many living expenses incurred by him and the other person that were paid during this time.  Mr. Bruni recognized the high probability that these expenses were paid with monies received for services not rendered, but billed, to Medicare.  However, he never knew for certain that a crime was carried out, nor that claims had been submitted for Reteplase injections.

Mr. Bruni first became aware of the Reteplase billings when he spoke to Special Agent McFadden over the phone in January 2005.  Although TriCenturion representatives attempted to contact Mr. Bruni approximately 17 months before the January 2005 phone call, the representatives did not succeed in reaching him and Mr.

Bruni was never informed of their phone calls or visits by the individuals who received them.

## III. ARGUMENT

### A. Offense Level Calculation – Intended Loss v. Actual Loss

The Presentence Investigation Report ("PIR" or "Report") calculates the Total Offense Level as 15. (PIR. ¶ 33.) This is higher than the Total Offense Level of 12 agreed to by the Government and the defendant.  This difference stems from the loss calculation under Specific Offense Characteristics pursuant to U.S.S.G § 2B1.1(b)(1).[5]  Under the plea agreement the loss was determined by the "actual loss" method: the amount Medicare actually paid for the false Reteplase claims;  which was $154,832,  increasing the base offense level of 6 by 10 levels, pursuant to § 2B1.1(b)(1)(F), raising it to level 16, based on a loss of more than $120,000 but less than $200,00.00.  The presentence report, however, recommends a loss calculation using the "intended loss" method: the amount billed to Medicare for the Reteplase injections: which was $423,800, (PIR. ¶ 26.), increasing the base offense level of 6 by 14 levels, pursuant to § 2B1.1(b)(1)(H), to a level 20, based on the "intended loss" of more than $400,000.  While the plea agreement is not binding on the Court, the specific facts and nature of this case support determining the Specific Offense Characteristics according to the actual loss as agreed by the parties pursuant to the plea agreement.  The Government, in response to the presentence report, also raised this objection.

---

[5] Another difference in the computation is that the Government agreed to an adjustment for acceptance of responsibility by two levels pursuant to § 3E1.1(a), while the presentence report recommends an adjustment by three levels pursuant to §3E1.1(b)  for acceptance of responsibility where the offense level before the operation of subsection (a) is 16 or greater and thus awarding Mr. Bruni a greater downward adjustment for his acceptance of responsibility.

The presentence report relies on the formula that "loss is the greater of actual or intended loss" and applies the intended loss amount accordingly.  U.S.S.G § 2B1.1, Comment. (n.3(A)) (2004).  Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." Id., Comment. (n.3(A)(i)). "'Reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, should have known, was a potential result of the offense." Id., Comment. (n.3(A)(iv)). Intended loss is "the pecuniary harm that was intended to result from the offense" regardless of the likelihood that it would occur. Id., Comment. (n.3(A)(ii)).

In Mr. Bruni's case, by definition, intended loss is inapplicable since the factual basis for the guilty plea is based on deliberate ignorance.  Mr. Bruni realized that the income from his medical practice for the services he rendered was not enough to pay for all his personal and business expenses which were paid.  After March 28, 2003[6], he became aware of the likelihood that his business and household were receiving monies from Medicare for services that were billed to Medicare but not actually performed.  At a time when Mr. Bruni was experiencing significant financial, emotional and health problems he chose to ignore this possibility and not to investigate the source of this income.

Mr. Bruni's role in his practice was primarily limited to the medical aspects of seeing patients, completing their medical forms and research.  Mr. Whaley handled all of the administrative and financial aspects of the medical practice as well as their personal finances.  Later, Mr. Chesnick assisted Mr. Whaley, particularly with claims to Medicare.

---

[6] During the hearing before the Court to enter the plea of guilty, Mr. Bruni stated that he first became aware of the possibility of illegal billing after the second large check was received.  Medicare issued two checks, each for over $70,000, for reimbursement for Reteplase injections: the first dated November 27, 2002 and the second dated March 28, 2003.  Transcript of Proceeding, CR No. 06-18, p. 30.

Records from the First National Bank of Omaha account, in Mr. Bruni's name, with

signature authority to the other person, indicate that over a five-year period, Mr. Bruni

signed only two checks from this account, both to his dental surgeon.  Furthermore, Mr.

Bruni did not sign any of the Medicare checks involving Reteplase claims.  Mr. Bruni did

not have actual knowledge, even under a conscious disregard analysis,  of the specific

Reteplase false billings scheme at any time during the relevant period, nor did he intend

any harm.  He first learned of the Reteplase billings when contacted by Agent McFadden

in January 2005, almost two years after the relevant period.

The actual amounts paid by Medicare are the only facts which Mr. Bruni should

or could have known about.  Therefore, the actual loss or actual payments of $154,832,

were the only reasonably foreseeable pecuniary harm which can be attributed to Mr.

Bruni for the conduct of Messrs. Whaley and Chesnick.

While the Guidelines' Commentary does not define the meaning of intent in

context of intended loss, courts have done so.  United States v. Alli, 444 F.d 34, 37 (1st

Cir. 2006) found that the intended loss is the loss that is reasonably expected.  In Alli, the

First Circuit Court of Appeals reviewed the lower court's calculation of the intended loss.

Id.  The defendant was convicted of mail theft after stealing credit cards during his

employment as a postal worker.  Id. at 36.  The defendant admitted he intended to trade

the theft items to an overseas buyer for money.  Id.  The lower court calculated the

intended loss to be the maximum credit available on each card,  though no actual loss was

incurred by defendant's actions.  Since the defendant had a reasonable expectation that

the cards would be illegally used, he had at least a reasonable expectation that such losses

would be incurred due to his actions.  Id. at 38.  The court affirmed the intended loss

amount based on the common law rule that "a person is presumed to have generally intended the natural and probable consequences of his or her actions." Id. Since the defendant was actively involved in the theft and knew why the buyers wanted the stolen credit cards, it can be presumed that he intended the use of the credit cards up to the credit limit of each account. Id. at 38-39.

Since Mr. Bruni was not an active participant in the billing of fraudulent claims he lacked an expectation of the intended loss since he was unaware of the amounts billed to Medicare. Mr. Bruni's only involvement was his failure to investigate the suspicious activities conduct of Messrs. Whaley and Chesnick. Thus, the common law rule, when applied, cannot permit the use of the intended loss of $423,800 because it is not reasonable for Mr. Bruni to have expected or to have known of the intended losses since they were never natural or probable consequences of *his* actions. The intended losses were, instead, the natural and probable consequences of the actions of others involved in the billing fraud.

The Fifth Circuit requires a higher standard in order for the Government to show intended loss: the defended must have actual, subjective intent. In United States v. Sanders, 343 F.3d 511, 515 (5th Cir. 2003), the defendant failed to disclose significant debt in a loan application. After being approved for the business loan, the defendant then filed bankruptcy which discharged the loan. Id. The lower court convicted the defendant for bank fraud after giving a limiting instruction to the jury asking them to determine whether the defendant intended to defraud the bank. Id. The defendant argued that he lacked the requisite state of mind and did not deliberately misrepresent his financial information. Id. At the sentencing hearing the defendant challenged the Government's

15

offense level calculation which was based on the higher proposed loan amount instead of the lesser actual loan the defendant received. Id. at 521.  In applying the sentencing guidelines the court found that where "the intended loss is greater than the actual loss, the intended loss is to be used." Id. at 522.

The court then determined that intended loss required an intent not to repay the higher proposed loan amount. Id.  Because the bank itself modified the higher loan amount to the amount eventually received by the defendant, the court concluded that "there was no legal basis upon which the Bank would be at risk to loan any amount more than the [actual loan]." Id. at 527. The court found that the lower court erred in accepting the two amounts as part of the same transaction. Id.  Since the Government failed to prove by a preponderance of the evidence that the defendant intended to cause this potential loss, the court vacated the sentencing and remanded the case to the lower court with sentencing instructions. Id.  The court wrote "in the absence of facts indicating an intent not to repay the loan, the actual loss must be used to calculate the defendant's offense level." Id.

While much of the decision's reasoning focused on fraudulent loan application, the court set forth the general principles that the Government must "[p]rove  by a preponderance of the evidence that the defendant had the *subjective intent* to cause the loss that is used to calculate his offense level. Id.  at 527 (see also United States v. Morrow, 177 F.3d 272, 301(5th Cir. 1999) (stating the court looks to the "actual, not constructive intent" when calculating the intended loss for sentencing).

Here, Mr. Bruni did not actually or subjectively intend to defraud the Government of any amount of money.  Thus, the only subjective state of mind attributable to him is

the high probability of the illegality of amounts actually paid.  Therefore, under both the

Fifth and First Circuit standards, intended loss does not apply to Mr. Bruni's case.

      For the reasons stated above, we request that the Court begin its consideration of

the departures requested below with the Total Offense Level of 12, as agreed to in the

Plea Agreement.

**B.  "Booker" Departure**

      We ask the Court to depart from the Sentencing Guidelines by 5 levels,  and

impose a sentence of probation without incarceration in this case.  The relevant case law

and statute, as well as the Guidelines themselves, support this departure.

      United States v. Booker, 543 U.S. 220, 245 (2005) held that the federal sentencing

guidelines are advisory, not mandatory.  The decision sets forth a two-step process for

sentencing determinations, holding that courts are required to consider the Guidelines'

ranges, but are permitted to "[t]ailor the sentence in light of other statutory concerns as

well" such as those addressed in 18 U.S.C. § 3553(a) (2004).  Id. at 245-46.

      Title eighteen of the U.S. Code section § 3553(a) enumerates the factors courts

must consider at sentencing including "the nature and circumstances of the offense and

the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  It also lists

factors that reflect the purposes of the criminal justice system; for example the sentence

must reflect the seriousness of the offense, provide a just punishment, deter (future)

criminal conduct, protect the public from the defendant, and provide "needed education

or vocational training, medical care[7], or other correctional treatment in the most effective

manner."  18 U.S.C. § 3553(a)(2).

---

[7] The medical care factor requires the court to provide adequate medical care where needed during
sentencing.  See, eg., United States v. Speight, 726 F.Supp. 861, 868 (D.C. Cir. 1989) (stating that the

The United States District Courts for the District of Colombia have adopted the two step process described in Booker.  In United States v. Edwards, U.S. Dist. LEXIS 16799, at *25 (D.D.C. Apr. 7, 2006),  the court referred to Booker's two step analysis as the standard to use. The court wrote "[a] district court shall first calculate...the range prescribed by the guidelines.  Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [] § 3553(a) before imposing the sentence."  Id.  The D.C. Court of Appeals also requires that § 3553(a) should be considered during sentencing as stated in United States v. Simpson, 430 F.3d 1177, 1183 (D.C. Cir. 2005), where the court explained "A district court's failure to consider the sentencing factors listed in 18 U.S.C. § 3553(a), for example, is a species of such non-constitutional (statutory) error."  The Court's requirement in Booker to consider factors set forth in § 3553(a) has been interpreted to convey more discretion to the judge at the time of sentencing.  The D.C. Court of Appeals wrote "If Booker's rendering the Guidelines discretionary means anything, it must give a district judge greater latitude on these issues...."  United States v. Gomez, 431 F.3d 818, 825 (D.C. Cir. 2005).

In addition, Booker discussed how diminishing sentencing disparity - one of Congress's goal in writing the federal sentencing guidelines – can be further promoted by looking at the "real conduct that underlies the crime of conviction."  Id. at 250.  The Court referred to fraud as a prime example of how an offense can be committed in a multitude of different ways and only by looking at the real conduct of the offender can the judge deliver an appropriate punishment.  Id. at 250-251.  The Court further describes

---

sentence should provide "appropriate medical care and vocational training for defendant while he is incarcerated....").

18

the type of uniformity that should be sought by the criminal justice system: "that uniformity does not consist simply of similar sentences for those convicted of violations of the same statute.... It consists, more importantly, of similar relationships between sentences and real conduct…"  Id. at 253-254.

### 1. Diminished Capacity

The physical and mental disorders which we discuss below are based on Mr. Bruni's medical records, beginning in 2001 and continuing to the present. Exhibit A is a set of all of the medical records we have been able to obtain.  Exhibit A contains treatment records from 8 sources, four of which are contemporaneous with the relevant period, one immediately follows the relevant period, and the remaining three cover Mr. Bruni's treatment from August, 2003, when he moved to Albany, NY to the present.

During the relevant period, Mr. Bruni suffered from diminished mental capacity which contributed to his commission of the offense.  Under the extreme circumstances of this case, the defendant's diminished capacity warrants a downward departure in the offense level, under Booker, the factors set forth in § 3553(a),  and the Guidelines themselves.

Section 5K2.13 of the United States Sentencing Commission Guidelines Manual ("Guidelines") states that "a downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."  U.S.S.G. § 5K2.13 (2004).

According to the Guidelines commentary, 'significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A)

19

understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong." Id., Comment. (n.1).

In the sentencing context, diminished capacity involves an "impairment of the intellect," an inability to "quickly or [] fully grasp ordinary concepts." United States v. Royal, 902 F. Supp 268, 270 (D.C. 1995). It includes "both organic dysfunction and behavioral disturbances that *impair the formation of reasoned judgments*." Id. (emphasis added). The defendant must be "unable to process information or to reason" and unable "to absorb information in the usual way and to exercise the power of reason." United States v. Goossens, 84 F.3d 697, 701 (4th Cir. 1996) (citations omitted).

Diminished capacity does not need to be the sole reason the defendant committed the offense in order to qualify for a departure, but it must be a "contributing factor." 84 F.3d at 702. When a § 5K2.13 departure is warranted, the extent of the departure should reflect the degree to which the diminished capacity contributed to the defendant's criminal conduct. U.S.S.G. § 5K2.13.

In Royal, the Court granted the defendant, Mr. Royal, a downward departure of five offense levels pursuant to § 5K2.13, finding that the defendant suffered a "significantly reduced mental capacity and…from delusional thinking" which "contributed at least 1/3 to his commission" of the offense. Id. at 273, 272. Mr. Royal was convicted of two counts of interstate transportation of stolen property for stealing approximately 1,641 books from Howard University. Id. at 269-270.

In reaching this conclusion, the Court relied on the findings of the two mental health professionals who evaluated the defendant. Id. at 272. The clinical psychologist

retained by the defense concluded that Mr. Royal suffered from a "thought disorder of psychotic proportion" which "mostly likely played a key role in his criminal activity."[8] This professional found that the Mr. Royal's "emotions strongly impact and reduce his ability to use logic in his decision-making and problem solving, thus impairing his judgment." In addition, he "suffers from subtle features of depression, …his thinking reveals significant cognitive slippage, …even in simple, clear circumstances he tends to see things differently than most people, and [] the risk of delusional thinking is high." Id. at 271.

In United States v. Edwards, 98 F.3d 1364 (D.C. Cir. 1996) the D.C. Circuit Court of Appeals upheld the district court's denial of a § 5K2.13 departure where the defendant produced a psychologist's report indicating the defendant suffered from "extreme introversion, …an inability to interact or connect with people and …pronounced distrust of others." 98 F.3d at 1367, 1372. The Court found that the defendant did not establish that such psychological problems effected her ability to reason. Id.

**i. Diminished Capacity due to Prescribed Medication**

Diminished capacity cannot be due to voluntary drug use or other intoxicants. However, case law suggests that prescription drug use can create diminished capacity. In United States v. Sanchez, 933 F.2d 742 (9th Cir. 1991) the Ninth Circuit Court of Appeals reviewed the district court's decision to grant the defendant a § 5K2.13 departure. The district court noted that the defendant became addicted to opiates during his recovery from a motorcycle accident and his drug use appeared to "have played a part" in his crime of bank robbery. 933 F.2d at 744.

---

[8] These findings were based on "psychological tests, clinical interviews with Mr. Royal, his mother and former wife, and the review of military records and medical records of previous psychiatric episodes." Id. at 271.

The court stated that "§ 5K2.13 permits a court to depart downward if the defendant suffered from diminished capacity that resulted from involuntary drug use, so long as the offense was nonviolent." Id. at 747. However, here the court found the district court inappropriately granted a diminished capacity departure because there was no evidence that the defendant had diminished capacity and the crime was sufficiently violent to bar a § 5K2.13 departure. Id.

In United States v. Mark, 425 F.3d 505, 506 (8th Cir. 2005) the defendant plead guilty to possession of child pornography. Mr. Mark argued that before he committed the offense, the dosage of his psychotropic medicine, prescribed to treat a bipolar disorder, was tripled, causing a "state of mania that made it impossible for him to control his addiction." 425 F.3d at 506. The district court refused to grant a downward departure because federal statute prohibits granting a § 5K2.13 departure for crimes involving child pornography. Id.

On appeal, Mr. Mark argued that the district court erred by not considering a downward departure on the basis of his involuntary intoxication, rather than diminished capacity. Id. The court found this distinction meaningless and upheld the district court's decision. The court noted that, when not precluded by statute, "[a] court may depart pursuant to § 5K2.13 when a defendant's reduced mental capacity is caused by involuntary use of drugs." Id. at 507.

In United States v. Hampton, 119 F.3d 7, 1997 WL 407858, at *1 (9th Cir. 1997) (unpublished) the defendant was convicted of 25 counts of wire fraud, mail fraud and conspiracy. Mr. Hampton alleged ineffective assistance of counsel in a 28 U.S.C. § 2255 petition on the grounds that his attorney did not present diminished capacity as a defense

at his trial nor as a mitigating factor during his sentencing.  Mr. Hampton suffered from a panic disorder for which he was taking medication.  Id. *1, *2.  The district court denied the petition and Mr. Hampton appealed.

The Ninth Circuit Court of Appeals upheld the district court's decision, finding that the failure to argue diminished capacity did not constitute ineffective assistance of counsel when there was no evidence supporting such a claim.  Id.  at *3.  The two physiatrists who had evaluated Mr. Hampton did not identify "any mental impairment that affect Hampton's capacity to reason and form intent."  Id. at *2.  The court also noted that Mr. Hampton's own testimony did not support a diminished capacity defense.  Id.  His testimony indicated that even while on medication, he was able to function well in operating a sales business.

### ii.  Application to Defendant Bruni

During the relevant period, Mr. Bruni's suffered from a diminished capacity.  His diminished capacity resulted both from the effects of the significant prescription medications he was taking at the time and his mental  disorders.  Mr. Bruni's ability to function in everyday life was compromised.  For example, he began seeing fewer and fewer patients until finally he had to give up his practice all together.  Moreover, his ability to make reasoned judgments was impaired which was a factor in his commission of the offense.  At some point during the relevant period "he recognized the high probability that his expenses were paid from funds for [medical] services not actually performed but billed to Medicare." (Statement of Offense, 4.)  The only the persons who could be submitting claims to Medicare for services not performed were his partner of over 20 years, Mr. Whaley,  and his patient, Mr. Chesnick.  As his capacity to function in

daily life worsened, and he faced the prospect that personal relationship and his professional career were about to crash in upon him, he could not, and chose not to face the possibility of finding fraudulent billings submitted to Medicare over his name.  His ability to form reasoned judgments was impaired; he was "unable to process information or to reason" and unable "to absorb information in the usual way and to exercise the power of reason."  Goossens, supra, 84 F.3d 697, 701 (4th Cir. 1996).   His mental impairment contributed to his decision not to investigate the high probability.

Mr. Bruni's diminished capacity was not the sole reason he committed the offense.  It did not prevent him from conforming his actions to the law or from recognizing right from wrong.  However, it was a "contributing factor" in the offense. The Court should consider this in relation to the offense's "nature and circumstances" and the defendant's "history and characteristics."

### 2.  18 U.S.C. § 3553

The Court should consider other factors specific to this case pursuant to 18 U.S.C. § 3553.  For example, Mr. Bruni contributed substantially to the diagnosis and treatment of patients with AIDS and with the HIV-infection. During Mr. Bruni's residency in the Georgetown University, Department of Internal Medicine, which he performed from 1982 - 1985, at the D.C. General Hospital, he treated indigent patients some of whom had opportunistic infections without any apparent immune deficiency.  By 1982, the Center for Disease Control, published a report which suggested the "acquired immune deficiency syndrome" ("AIDS") might be transmitted by sexual conduct or through blood or blood products. Few doctors would try to treat these patients, and even fewer worked for a cure."  Mr. Bruni did.  He,  among a group of a few doctors, the "mavericks",  tried one,

then two, then more antiretroviral agents, in specific and alternating combinations and in repeating regimens.  Mr. Bruni worked to develop a database to collect date in a uniform way, analyze it, and distribute it to clinics around the country.  The United States and the World Medical Community would not accept this form of treatment until 1996.  Now, Highly Active Antiretroviral Therapy ("HAART") has allowed HIV-infected individuals around the world to live longer.   As mentioned in the facts, Mr. Bruni's approach to treating AIDS and  HIV-infected patients was ahead of its time.  While many of Mr. Bruni's patients died, many survived.  But the failures and the successes came at a very high cost to Mr. Bruni.  For years, Mr. Bruni dealt with dying patients on a daily basis, straining his mental and emotional stability.  Yet he remained committed to his patients, and a cure, and collecting and distributing useful data so that other doctors might find that cure.  In many cases, Mr. Bruni provided treatment without charge for patients who could not afford it, Raymond Chesnick being one of those patients.  Mr. Bruni exercised compassion and self-sacrifice in contributing to the point at which we are today.   We ask that the criminal justice system,  in turn show a similar compassion upon the defendant.

Additionally, the Court should consider Mr. Bruni's potential for future contributions to the medical field which would be impeded by a sentence which  included incarceration.  Upon completing treatment for his mental and physical disorders, Mr. Bruni intends to complete a certificate program, and possibly a masters degree, in medical informatics and ultimately find work in this field.  Given Mr. Bruni's high intelligence and commitment to the medical professional, he is likely to significantly contribute to this area if given the opportunity to do so.  This is a mitigating factor that the Guidelines may not adequately take into consideration.  18 U.S.C. § 3553(b)(1).

Moreover, under § 3553, the Court should consider the need for the sentence "to provide the defendant with needed educational or vocational training, medial care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Mr. Bruni is currently undergoing an intensive out-patient treatment program for his mental disorders. He is in the process of negotiating with his insurance company for the surgical placement of a spinal implant to relive his back-pain. The implant would reduce or eliminate his need for pain medications which would aid tremendously in his rehabilitation. Incarceration would make it impractical and likely impossible for Mr. Bruni to obtain both of these treatments, as well as pursue his plans for further education and training in the medical field.

### 3. Real Conduct

Mr. Bruni's actual conduct in committing the offense is not reflected in the sentence the probation office recommends, based on a strict adherence to the Guidelines. Mr. Bruni was not involved in the planning or execution of the offense. In fact, he did not become aware of the possibility of the illegal conduct until the end of the relevant period in question. At that point, his reduced mental capacity significantly contributed to his decision not to investigate his suspicions of illegal billing activity. Thus, the Court should consider Mr. Bruni's diminished capacity in reviewing his "real conduct" in the offense. Mr. Bruni's conduct is far less egregious than the conduct of Messrs. Whaley and Chesnick, yet will not be prosecuted for Medicare fraud. While Mr. Bruni, as he stands before this Court, should and will be held accountable for his *inaction*, in this case, incarceration is extreme and unwarranted.

Respectfully Submitted,


s/Michael L. Fayad
Michael L. Fayad
District of Columbia Bar No. 91694 Greenberg
Traurig, LLP
   1750 Tysons Blvd.
Suite 1200
McLean, VA  22102
Telephone No. 703.749.1300