# Exhibit B - Part 2

# ARCHIVE

## Washington City Paper

## Cover story

**From the September 15, 1995 issue.**

## Side Effects

**Dr. Larry Bruni may have cured Raymond Machesney of HIV infection. So why is D.C.'s most radical AIDS doctor broke?**



## By Bill Gifford

September 15, 1995

7138 words.

It sounded too good to be true. In the March 9 *New England Journal of Medicine*, researchers at the National Institutes of Health (NIH) reported a startling breakthrough in AIDS treatment. HIV-positive patients who took a drug called Interleukin-2 (IL2) showed marked improvement. Their T-cell counts, the principal measure of immune system strengths, rose dramatically, and the concentration of virus in their blood dropped.

Most HIV therapies act like parachutes: They merely slow the virus's inevitable progression. IL2, which was discovered as a cancer treatment in the '70s, acts more like a hot air balloon. It is the first drug that has been shown to reverse some effects of HIV infection.

"This study provides the strongest evidence so far that it may be possible to rebuild and maintain the damaged immune systems of HIV-infected individuals," announced Dr. H. Clifford Lane, head of the NIH research team.

Mike Menius could have told him that. In 1993, the government relations manager for Motorola was on the brink of full-blown AIDS. His T-cells, as well as his hope, were disappearing steadily. "I was going downhill," he says. He had been diagnosed with HIV in 1988, and his time seemed to be running out.

But when the NIH results were announced, amid a gush of publicity, Menius was alive and well—healthier than he'd been since he became

LMB00039

infected. He had been undergoing IL2 treatments for two years under the supervision of his physician, Dr. Larry M. Bruni. After his first round of the grueling therapy, his T-cell count zoomed from 200 to more than 600—a nearly normal level. Thanks to regular IL2 treatments, his count has stayed high ever since, while the amount of virus in his blood has fallen more than 90 percent.

"I'm just tickled," says Menius, 49.

Menius was at the head of the line when Bruni began prescribing IL2 in January 1993, shortly after NIH's own study began. Bruni eventually went beyond prescribing IL2 to promoting it. Until a few months ago, he also advertised his IL2 regimen in the *Washington Blade* and in national gay magazines.

By the conservative standards of his profession, Bruni's ads were unrestrained. "Aiding the Immune System in HIV Disease," blares the headline of one recent pitch. The ad copy goes on to describe, in polysyllabic jargon, the near-miraculous benefits of IL2 therapy for people infected with HIV. Best of all, treatment with the wonder drug is just a phone call away. At the bottom of the page is a mock prescription form for 18 million international units of IL2, signed by Dr. Larry M. Bruni, M.D.

But there is much that the audacious ad does not mention, both about IL2 and about Bruni.

The 43-year-old physician has earned a reputation, partly self-generated, as the most aggressive AIDS doctor in town. In the gay community, Bruni is known as the doctor to see if you want to put up a fight, and he is noted for his radical, interventionist approach to the disease. For nearly a decade, he has been prescribing the most advanced treatments, the experimental drugs that have not won Food and Drug Administration (FDA) approval. And he has marketed his practice almost as vigorously.

Other local HIV doctors (there are about half a dozen) concede that Bruni displays an uncanny intuition about AIDS, but they are sometimes uncomfortable with his double-barreled treatment style. "If I were HIV-positive, I would probably go to Larry Bruni for consultations, and to toss things around with," says one physician who has worked with Bruni. "He would provide excellent *second* opinions."

Another physician is more blunt. " 'Aggressive' is a poor word choice" to describe Bruni, says this doctor, who treats many patients with HIV. " 'Reckless' might be better."

Consider Bruni's use of IL2, a strategy that is both savvy and risky. He was suggesting IL2 to patients as long as five years ago, when the drug was only available from underground "buyers' clubs." Even now, after the publication of the NIH study, IL2 is considered a radical therapy whose long-term efficacy and potential for harm are unknown. It only seems to benefit about a third of patients, generally those who have not yet developed full-blown AIDS. And D.C.'s other HIV doctors say they hesitate to prescribe IL2 because it causes severe and unpleasant side effects.

But Bruni rarely hesitates to recommend it. For the type of patients he and his ads seem to attract, IL2 is a gamble worth taking. "The typical doctor was playing a safe game with HIV patients and watching them go downhill and saying, "but I prescribed everything that is completely and legally approved,' " says Menius. "Dr. Bruni offered exactly what I was looking for. I owe my life to Dr. Bruni."

The controversial treatment is a gamble for Bruni as well. Two years ago, Bruni operated one of D.C.'s largest AIDS practices: He treated 1,500 patients at a plush Capitol Hill clinic. Now his practice has shrunk to only 500 patients, whom he sees at a small office a couple of blocks away from his old digs.

Bruni's problem is that IL2 is not his first gamble. Several side ventures, including a pharmacy and a medical software company, collapsed. The pharmacy debacle left him owing more than $200,000, according to court documents. A joint venture with a patient services company called Curaflex landed him in a nasty court fight that could mean he ends up owing Curaflex hundreds of thousands of dollars more. Those fiascoes, exacerbated by a squabble with Blue Cross/Blue Shield of the National Capital Area, the Washington area's most powerful insurer, propelled Bruni's practice into bankruptcy in 1994.

And on top of these disasters, Bruni has just lost a bizarre malpractice suit brought by a gay ex-priest named Raymond Machesney. Bruni had treated Machesney for HIV infection for five years, but Machesney subsequently tested negative for the virus. At the trial in June, Bruni's lawyer argued that the priest had been cured of the virus. The jury rejected that extraordinary claim and awarded Machesney $4.1 million in damages against Bruni and two co-defendants. Bruni will appeal the verdict, according to his lawyer.

In the meantime, his finances in shambles, his relationships with insurers on the rocks, his patient base eroding, and his medical judgment in question, Bruni is apparently staking his own future on IL2. For Bruni—as much as for his HIV-infected patients—the expensive and risky

LMB00041

wonder drug provides one final, fleeting hope.

"I was the first one to do it," Dr. Bruni is telling a patient on the phone. "I was the first doctor to take it outpatient, and I've seen some good results."

He takes a sip of iced tea laced with artificial sweetener, and goes on to describe the known side effects of Interleukin-2 to his worried patient. The side effects are many and serious, and include hypotension and pulmonary edema (water in the lungs). But severe reactions, Bruni hastens to add, are usually only experienced at the high doses with which IL2 is used to treat cancer patients—its sole FDA-approved use, by the way. At the lower doses required for HIV treatment, he says reassuringly, patients suffer symptoms that are more like a bad bout of flu.

"I haven't had anybody hospitalized" from IL2 side effects, he tells the patient.

Bruni is sitting at a cluttered desk, one of four cluttered desks occupying the back room of his storefront office at 631 Pennsylvania Ave. SE. It's not immediately clear that he's a doctor. His hair is thin and slightly frazzled, and his feet are propped on the desk. He might have a lab coat tucked in the back of some closet, but he never wears it. His work uniform consists of Reeboks, black jeans, and a white cotton-poly short-sleeved shirt.

At the other desks sit a secretary, a medical assistant, and a gray-haired man who is Bruni's business manager and also his longtime companion, Gary Whaley. Visible through a glass window is a phlebotomist, toiling in the lab—the fifth and last employee of the Vanguard Medical Group, as Bruni's practice is now known.

The office is a work in progress. Bruni moved here after he was evicted from his old quarters in May, and he hasn't finished construction yet. To get from his desk to the waiting area and examining rooms, he must descend two wooden steps made of nailed-together two-by-fours, then navigate past stacked and sagging cardboard file boxes. The walls dividing the examining rooms reach only two-thirds of the way to the high ceiling, not enough to muffle the intermittent screech of power tools.

Bruni leads the way to the waiting area, furnished with three wooden chairs and a glass end table. Arty posters on the walls exhort passers-by to use condoms, in German. Tinny music issues from a small transistor radio on the floor. A former employee made off with the sound system,

LMB00042

Bruni explains, silencing the device with a yank of its plug. We take our seats. Each of us turns on a tape recorder.

This bare-bones ship and its skeleton crew are all that remains of one of D.C.'s foremost AIDS practices. Three years ago, Bruni's professional corporation employed two other doctors and a support staff of 18. There were 10 examining rooms, and for a period in 1993, patients could fill their prescriptions on the spot, from Bruni's well-stocked in-house pharmacy. Bruni's elegant office occupied the entire second floor of the office building at 801 Pennsylvania Ave. SE, a block-and-a-half away from his humble new digs.

"The first thing you saw when you got off the elevator [at his old office] was this very large fish tank, right next to the nurse's station," recalls Steve Schneebaum, one of Bruni's lawyers. "In the waiting area was a cold-drink cooler, with juices and sodas to take, and there was nice art on the walls."

"It was an office that was probably too luxurious for the kind of cash flow it had," Schneebaum adds. "But it was great. I really enjoyed going there."

The swank office was meant to provide a welcoming environment for his terminally ill clients, 95 percent of whom were gay men. Almost all of Larry Bruni, P.C.'s patients had two things in common: They were infected with HIV, and they wanted the most vigorous possible treatment.

Bruni himself is hyperarticulate and occasionally flippant; whole paragraphs come spewing out of his mouth at once. He works at a higher baud rate than most listeners can handle, which would be off-putting if he didn't have abundant charm to go with it.

"I get along very well," he says, "with sick gay men." As well he should: He has lived with one for more than a decade. Whaley has been infected with the HIV virus since 1985 (Bruni says he himself is not infected). So his patients' struggle is, to some extent, his own.

Bruni's reputation as a cutting-edge doctor—a physician on the fringe, but not a quack—brought Father Raymond Machesney to his waiting room on April 23, 1987.

According to court testimony, Machesney, then 50 years old, had been in and out of the priesthood since 1967. He had left it before he came out as a homosexual in the '70s, but had re-entered the church (and left it again) in the '80s. He and his partner, Larry Miller, knew Bruni socially and

professionally. Miller, a lawyer and accountant, would later do legal work to establish Bruni's professional corporation. He also kept Bruni's books and prepared his tax returns. Miller was already a patient of Bruni's.

Machesney told Bruni he had tested positive for HIV back in 1985, but had done nothing about it for 18 months. On that first visit, Bruni later testified, Machesney said he wanted aggressive treatment.

He got it. Machesney showed no symptoms of AIDS at the time, and his T-cell counts were relatively normal. Nevertheless, at that first appointment, Bruni prescribed a small dose of naltrexone, a drug normally used to treat opiate addiction but which, at that time, was thought to benefit HIV patients as well.

Machesney would stay on naltrexone for five full years, but Bruni soon added other medications as well. First came acyclovir, a drug that combats the herpes simplex virus to which men with HIV seem unusually prone (although Machesney never developed herpes). Acyclovir also fights shingles and Epstein-Barr, viruses that often attack HIV patients.

For Machesney's anxiety and depression, Bruni prescribed Zoloft and Valium. He also suggested Houba, an amino-acid preparation that tastes, the doctor says, "like motor oil." Later, Bruni put Machesney on the antiviral agents AZT and ddC. Testifying about the side effects of AZT, Machesney said: "My toes hurt so bad I wished I could cut them off."

Bruni's regimen required Machesney to take as many as 30 pills a day, and Machesney testified that he never missed a pill. For long periods, he was gobbling acyclovir six times a day, waking up at 2 and 6 in the morning for his dose. He visited a Washington buyers' club in search of medicines that had not been FDA-approved—and were thus not legally available in this country. He took the tablets from a pillbox equipped with an alarm clock that beeped at medication time, a constant reminder of his fatal condition.

As if he needed to be reminded. Machesney had not coped well with the news that he had a fatal virus, according to testimony and court records. (In a brief telephone interview, Machesney declined to comment.) At one point, he made a sketch of his own tombstone, which was later introduced in court—as was the pill alarm. His lover Miller, was already infected and eventually died of the disease in January 1993.

Physically, Machesney was relatively healthy. His T-cells stayed high, dipping below 500 only once or twice. And he exhibited few symptoms

other than a skin condition that Bruni termed "HIV dermatitis." He was
doing pretty well; suspiciously well, perhaps.

Machesney and Miller soon found out why. In May 1992, they traveled
to Greenwich, Conn., to see Dr. Gary Blick, another AIDS doctor. Miller
had reached an advanced stage of the disease, and Blick was doing an
experimental treatment for people with full-blown AIDS, transfusing
them with blood products from HIV patients who were asymptomatic.

Since that kind of blood was in short supply, Blick required patients
seeking the treatment to bring a donor with them, and Machesney fit the
profile. So Blick took blood from Machesney as well, and asked him the
basic HIV questions: when was he tested, what drugs was he on, what
were his latest T-cell counts.

"Dr. Blick said, "Well, your T-cells are higher than mine, and I'm not
infected,' " Machesney testified. On a hunch, Blick had Machesney's
blood tested for HIV antibodies. A couple of days later the results came
back, showing that Machesney was, in fact, HIV negative.

Blick called Bruni on Friday, who thought about it over the weekend
before calling Machesney with the news. "Are you sitting down?" Bruni
then asked his patient, according to Machesney's testimony. "I've been
poisoning you for all these years."

Machesney called his lawyers. The lawyers sued Providence Hospital,
the lab at Providence where Machesney had been tested in 1985, and
Bruni.

When he placed that last phone call to Machesney on May 31, 1992,
Bruni was doing well professionally—better than he might have
expected, given his credentials. He majored in French at Georgetown
University during the early '70s, and by his own admission had spent
more time in Georgetown's gay bars than in the library. He came out as a
19-year-old sophomore. Not long after that, he met Gary Whaley, six
years his senior and the man who would become his lifelong partner.
They live together in the Brookland neighborhood of Northeast.

Bruni believed that his true talents were linguistic: He spoke Arabic,
Chinese, French, and Italian. But after graduation, he knocked around the
margins of the medical profession, eventually working as a nursing
assistant in a psychiatric hospital. As he observed the psychiatrists at
work, he decided that he wanted to be a doctor. "I said to myself, "I can
do that,' " he says. So he took a one-year crash course in hard sciences
and went off in 1978 to study medicine at the American University of the

LMB00045

Caribbean, in sunny Montserrat.

When he graduated in 1982, Bruni returned to Washington to begin a three-year residency at D.C. General Hospital. But District authorities wouldn't let him sit for the state licensing exam—wouldn't even accept his application fee, in fact—because he graduated from a foreign medical school. So he worked for six months in Virginia, at a walk-in clinic he calls a "doc-in-a-box," and passed the Virginia exam with an 82. That score should have allowed him to waive into D.C., but didn't. After considerable legal arm-twisting, the D.C. Board of Medicine grudgingly granted him a license in December 1985.

"I've been struggling from the very beginning," Bruni says.

With AIDS ravaging gay America, Bruni had few doubts about what specialty to choose. When he earned his license, Bruni signed on to work with Dr. Cesar Caceres, a doctor with an AIDS practice on Q Street NW. That arrangement lasted less than six months. When Machesney first came to see him in 1987, Bruni was working with Dr. Michael Pistole on F Street NW. At that point, Bruni had been treating AIDS and HIV-positive patients for about two years.

In each office, Pistole's and Caceres', Bruni chafed against what he saw as his boss's conservatism. When Bruni left Dr. Pistole's practice in September 1988 to set up his own shop, Machesney came with him—along with 400 other patients. By 1991, Bruni was hiring other doctors to help handle his overflowing caseload. He began cutting a high profile in the local AIDS community. The *Washington Post* quoted him frequently, and he was interviewed on CNN and the *CBS Evening News.*

Bruni became popular with Washington's HIV-positive gay men because he positioned himself on the leading edge of AIDS treatment. HIV medicine is more akin to detective work than traditional family medicine. AIDS doctors spend less time tapping knees, thumping chests, and saying, "turn your head and cough" than general-practice doctors. Instead, they pore through journals and search computer databases, sifting through the heaps of information that are generated about the illness almost daily.

This information comes not only from traditional scientific sources like NIH and the *New England Journal of Medicine*, but also from the community of educated laypersons that has sprouted around the epidemic like a shantytown around the ivory tower of medicine. There are Internet newsgroups and Web pages and America Online forums about AIDS, as well as newsletters and even a glossy lifestyle magazine, *Poz.*

Bruni has a boundless curiosity about the disease and a seemingly encyclopedic memory. He scours the medical literature and the alternative AIDS press, seizing on anything that might possibly work. "There are improvements every month that happen, like random mutations in evolution, that confer some ability to fight the disease," he says, "and if somebody's watching it, they will try to use it and make it into a treatment."

Some of the new treatments are fads, miracle-cures-of-the-month that fade away and are forgotten. Others show results, which in HIV terms means they simply stave off the inevitable. Many of his colleagues, Bruni says, are afraid to try any of the new treatments. "In a lot of community physicians' minds, this disease is fatal," he says. "[They tell themselves,] "I don't have to do anything to try to stop it.' "

"I don't believe that it is unstoppable," he continues. "I believe in a large majority of the cases, there are correct things—which are not secret, cabalistic things, it's not like I'm the only doctor who knows them—but there are a lot of doctors who know it and they're afraid to try it, they're afraid to try new things."

Nonsense, counters another HIV doctor, who wishes to remain anonymous. "Ever since this began, people have been as aggressive as they could possibly be," this doctor says. "It's just not true that everybody else is just passively sitting on this thing."

But it is true that Bruni has been more willing to experiment than others in his field. "Years ago, I was looking to him for ideas, because he was a doctor who was doing new treatments," says John James, publisher of *AIDS Treatment News*, a San Francisco newsletter written for nondoctors. "That's what he's done all along."

Bruni was prescribing AZT in 1987, before it was officially approved. He enrolled patients in a study—a so-called "open-label" protocol— sponsored by Burroughs-Wellcome (now Glaxo Wellcome), the maker of the drug.

"I had 27 people on that protocol," he says proudly. "One other doctor in the city had 11—that was the closest number."

The "study" was really nothing more than a formality by which some patients, who fit certain general criteria, could obtain the new drug without waiting for FDA approval. AZT was the first drug to be made available on that basis, but pre-approval use is now standard for AIDS drugs. By the time a drug is officially OK'd, it's almost old hat. As each new treatment has rolled down the pipeline—drugs such as ddC, ddI, d4t,

LMB00047

and most recently 3TC—Bruni's patients have been first to the pharmacy.

"Bruni was always seen as the source, the way to get your hands on experimental things," recalls one former patient.

On Bruni's desk when I visit him, for example, is a big bottle of a prescription drug called hydroxyurea, which was once popular as a cancer treatment. Hydroxyurea has been shown to drag down the "viral load"—the concentration of active virus in a patient's blood. But it also whacks certain beneficial white blood cells, leaving HIV patients dangerously vulnerable to fungal and blood infections. Before I showed up, Bruni had been diluting the capsules in water, attempting to figure out how to deliver a lower dose of hydroxyurea, a dose that might quench the viral load without harming the immune system. In the meantime, he says, he is giving interested patients free pills out of the bottle. It might work, or it might not; to Bruni, it's worth the risk.

When the malpractice case came to trial in June at the U.S. District Court for D.C., the very aggressiveness that had made Bruni successful—the very aggressiveness that had brought Machesney to his waiting room—played to the doctor's disadvantage. Machesney's lawyers emphasized the fact that Bruni prescribed AZT to Machesney in 1991 when his T-cell count stood at a robust 817 per milliliter of blood. When AZT was approved in 1988, it was recommended only for patients with fewer than 200 T-cells. Bruni was legally permitted to prescribe AZT to Machesney no matter what his T-cell count was: Once it approves a drug, the FDA restricts only what a drug manufacturer may say about the product. The agency does not restrict how doctors may use it.

Such early intervention was standard operating procedure for Bruni, and recent research has vindicated his approach. For an HIV patient, prevention is the next best thing to a cure, and, in general, scientists are discovering that the earlier such drugs are used, the longer HIV patients seem to survive. The benefits of AZT diminish over time, and people who start taking it early, while they're still asymptomatic, seem to benefit from it longer and suffer fewer side effects, according to Project Inform, a San Francisco-based AIDS information service. The FDA has since approved AZT for use at 500 T-cells.

Machesney's lawyers also took Bruni to task for prescribing acyclovir, the herpes drug, when Machesney didn't have herpes. Bruni commonly gives acyclovir as a preventive. He also believes that it works in synergy with AZT.

Machesney's lawyers, predictably, painted Bruni as a callous doctor who pumped his patients full of toxic chemicals. "Dr. Bruni likes to prescribe

LMB00048

drugs," lawyer David Curtin taunted during closing arguments. "He likes to be known as a big prescriber."

This may be true, but it does not necessarily make Bruni a quack. HIV medicine is not black-and-white: There is no rule book because there is no cure. Not only do AIDS patients often take drugs that have not been approved by the FDA, but their doctors commonly prescribe drugs for off-label uses. The AZT/acyclovir combination, which Bruni prescribed for Machesney at one point, is one of many unofficial treatments used in HIV medicine. In a fatal disease that has no cure, long-term side effects, if any, are largely irrelevant.

"Nobody really knows the "right way' to use these things, including AZT," says James of *AIDS Treatment News*. "Until 40 years ago," he points out, "all medical progress came from clinical experience."

It is to the gray areas that HIV patients flock in large numbers, seeking hope where conventional medicine offers little. The gray areas are where the charlatans operate, with their miracle vitamins and wonder herbs. But it is in the gray areas where progress occurs.

Bruni's full-page ads promised "aggressive" treatment for the disease, drawing the more defiant segment of the HIV population into his office. "At my very first appointment, I said I'm not going to be somebody who's just going to sit back," says one Bruni patient, a federal employee in his 40s who we'll call "Kevin." "I want aggressive treatment, and I want experimental treatments," he says he told Bruni.

Bruni espoused an equally macho approach to the disease, most memorably in a 1992 Steve Twomey column in the *Post*. "Some of them die as sniveling cowards," Bruni said of his patients, "and some of them are incredibly courageous and I admire them."

The outraged calls poured in, of course, and Bruni insists he had said "as I would" after "sniveling cowards." Twomey says his notes confirm the quote as printed. With or without the addendum, the comment reflects Bruni's shoot-from-the-hip style.

He prospered despite that flap. In 1992, Bruni's practice took in more than $1.5 million, according to court records. Bruni, who had always taken risks in treatment, began gambling with his business. He formed a partnership with a company called Curaflex, which administered intravenous infusions to patients in their homes. HIV patients require lots of infusions, especially as their illness progresses. Bruni saw a way to serve more patients; Curaflex wanted access to Bruni's patient base.

The deal was complicated but potentially lucrative for both parties. Curaflex would service some 50 patients according to Bruni's orders, and the company would bill the insurers for those patients under Bruni's name. The insurance companies would pay Bruni, who would forward to Curaflex 70 percent of the gross, keeping a healthy 30 percent as profit for himself.

But the agreement was fatally flawed. It required Bruni to pay Curaflex 70 percent of the amount billed, regardless of how much he actually collected. Curaflex began billing for Bruni in September 1992. Within three months, the joint venture had degenerated into a civil war. Some insurers wouldn't pay the amounts Curaflex billed, which often ran into the thousands of dollars for services that Bruni had not previously provided.

The bills themselves were sometimes outlandish. One Curaflex-prepared invoice requested payment for a 100-ml. bottle of saltwater. The price? $656.17. That particular claim, unfortunately, was submitted to Blue Cross/Blue Shield of the National Capital Area, the dominant regional insurer. At the time, Blue Cross covered a majority of Bruni's patients. Bruni was a so-called participating provider, which meant that Blue Cross would reimburse him directly, at pre-approved payment levels for particular services. But Blue Cross refused to reimburse him for many of the new Curaflex services.

As the Blue Cross payment stream dwindled, Bruni was caught between the insurer and Curaflex, which was vociferously demanding its share of the proceeds. But Bruni lawyer Schneebaum says Curaflex never showed its bills to Bruni. Having no idea how much he owed Curaflex, Schneebaum says, Bruni simply held onto the money, which was kept in a separate account at Riggs Bank. A December 1992 meeting between lawyers for Curaflex and Bruni broke up acrimoniously, and Curaflex sued Bruni in federal court two days before Christmas 1992.

Whereupon Bruni did something strange: He used the money in the Riggs account—about a quarter of a million dollars that he admits he owed to Curaflex—to open his own pharmacy. He stocked the pharmacy with $200,000 worth of wholesale drugs, for sale to his patients. His hope was that the pharmacy would earn enough money to pay off his Curaflex debt, whatever that turned out to be. It would also help his patients get IL2, which was generally unavailable from the corner pharmacy.

But instead of bailing him out, the pharmacy only added to Bruni's woes. The pharmaceutical supplier filed suit against Bruni, claiming that it was

never paid. A deal to sell the business fell through.

And relations between Bruni and Blue Cross were becoming hostile. Bruni's billings from September 1992 through April 1993 had jumped 565 percent over the previous eight-month period—a trend that did not escape Blue Cross' attention.

Bruni and Whaley claim that overbilling by Curaflex caused the problems with Blue Cross. But Schneebaum, Bruni's own lawyer, warns, "There's no necessary congruence between" Curaflex's contract and Blue Cross' complaints.

Blue Cross also requested an audit of Bruni's medical files, but Bruni refused, citing the need to protect patient confidentiality. Blue Cross demanded open access to patient files; Bruni would grant access only with regard to specific, disputed claims. Meetings ended in angry confrontations, nasty letters were exchanged, and in the end Blue Cross wielded its power of the purse. By September 1993, the weekly checks from Blue Cross had stopped altogether and Bruni was laying off staff. In December, he finally dropped out of the participating provider program.

"As long as I was a [participating] provider, I could not collect money from patients," he explains. "So I had to withdraw from the contract to collect money." Patients now had to pay up front, then file their own claims for reimbursement, which Blue Cross commonly denied, according to Bruni and some patients. Blue Cross covered about half his patients, he says, and most of them ultimately left his practice for other doctors who had more amicable relations with the insurer.

One who stayed is Kevin, who had studied at Georgetown with Bruni. Kevin tested positive in 1987, and saw Bruni's ad in the *Blade* shortly thereafter. For five years, Blue Cross covered his treatments—which were often very expensive—without question.

"In the middle of '93, I started getting these rejections" from Blue Cross, Kevin recalls, sitting in the small Dupont Circle apartment he shares with a cat and a NordicTrack exercise machine.

Suddenly and without explanation, Blue Cross began refusing to pay for things it had covered in the past. The first time Kevin took IL2, in May 1993, Blue Cross reimbursed him 75 percent of the $2,330 cost. When he repeated the treatment in September of that year, he got nothing. Other, lesser charges were also disallowed: a $90 office visit, for example, and a $133 blood test. Now Kevin foots his medical bills himself. Since 1993, he has spent more than $11,000 in Bruni's office, all from his own

pockets, and including three courses of IL2.

Not all of Bruni's patients were so loyal, or so well-heeled. As patients left, the doctor's revenues plummeted from $2 million in 1993 to less than $400,000 in 1994, according to court records. He filed for bankruptcy protection in May 1994.

His practice stayed afloat, but barely. The creditors discovered that the office artwork, a potential asset, had been purchased by one Gary Whaley for some $53,870.64. The money had been lent by a patient and friend in San Francisco. In a bankruptcy court deposition, Whaley admitted that another $58,000 of receipts from Bruni's prior practice had been "inadvertently" transferred to Vanguard, the new company, which—sorry, guys—had spent the money. That left less than $20,000 for Bruni's many creditors.

One of the few creditors with any leverage was the landlord at 801 Pennsylvania Ave. SE. The eviction crew showed up at Bruni's door on the morning of May 12, 1995, and all hell promptly broke loose. Crew members rummaged through the pharmacy, pocketing syringes and who knows what else. Bruni saw other crew members dumping containers of used, bloody needles into plastic trash bags as a fireman emptied the refrigerator of blood samples and experimental medications. It was an ignominious finale.

Bruni installed himself up the street at 631 Pennsylvania, in a building owned by a friend. The eviction was only the first in a series of humiliating episodes that included the Machesney malpractice trial in June and, four days later, the trial of Curaflex's lawsuit.

"That's two months without really concentrating on patients," Bruni says. "I'm surprised I still have a practice."

Machesney's lawsuit presented the federal court jury with a fascinating and impenetrable mystery. The two sides' versions of the basic facts do not mesh at all, particularly on the root issue: Was Machesney HIV-positive, or not? On this question rest the reputations of Providence Hospital, its lab, and Bruni. We'll never know the answer for sure.

But here is what we do know, according to the evidence. When Machesney's lawyers filed their complaints, there was one person who was conspicuously not sued: Dr. Forest Harris, Machesney's longtime family physician and the doctor who originally tested him. Harris testified that he had drawn Machesney's blood in the fall of 1985 and sent it off to the Providence lab to be tested. An HIV test really consists of two separate tests, an initial test, called an ELISA, and a second,

confirmatory test called the Western Blot. Both tests showed that
Machesney had HIV, Harris testified. Harris sent Machesney to
Providence to be tested there, and again the results came back positive.

That adds up to a total of four positive HIV tests, if Harris' and
Machesney's testimony is to be believed. There are no documents to
verify their claims. Harris destroyed all of his patient records when he
retired in 1991. And, curiously, nobody else seems to have a record that
Machesney was tested, not even the lab. In 1985, Providence wasn't
testing for HIV in-house, but rather sending blood to three outside labs.
None of the three have any record of receiving Machesney's blood.

Machesney's lawyers argued that the priest had been negative all along,
and thus Bruni had an obligation to re-test him (a procedure for which no
insurance company would have reimbursed Bruni, since Machesney had
already been diagnosed). They also faulted Bruni for not getting
Machesney's records from Dr. Harris, an odd contention given that the
records would have confirmed that Machesney was HIV-positive.
(However, notes Bruni's lawyer, Daniel Cotter, "[The records] would
have saved [Bruni's] ass.")

Bruni had every reason to assume Machesney was positive, Cotter
argued. When he came to see Bruni, the priest was a 50-year-old gay
man whose lover was infected. During trial, Machesney admitted having
had sex—including anal sex—with several different men since the
1970s. And he told Bruni he had tested positive twice. One of Bruni's
expert witnesses, Dr. David Sacher of Georgetown University Medical
Center, testified that the chance of obtaining four false positives for one
person from one lab was about one in a million.

This evidence got Bruni off the hook for not re-testing Machesney
himself, but it put him in an even more awkward posture vis-à-vis the
jury. By contending that Machesney must have been HIV-positive,
Bruni's only plausible argument was that Machesney had somehow
conquered the virus. In the lingo of the disease, he had "sero-reverted."
In plain English, he had been cured.

The jury didn't buy it, of course. The lawyers for the Catholic priest
argued strenuously against such a miracle. Bruni himself avoids claiming
credit for having cured Machesney—but he insists that Machesney was,
at some point, HIV-positive.

Spontaneous sero-reversion is not unknown. The medical literature has
reported a handful of cases where an HIV-positive patient suddenly,
somehow, became HIV-negative, the most recent of which took place in
an infant in Los Angeles who had been born with the virus. Based on

these cases, Bruni's medical-expert witnesses would not rule out the possibility that Machesney sero-reverted.

Between that medical possibility and the common person's belief that HIV is a death sentence lies an unbridgeable gap. To argue sero-reversion in front of a jury was a huge risk, and it didn't pay off. But if Machesney did defeat the virus, and it could be proven—that is, if a vial of his blood from 1985 could somehow be located and tested—then Larry Bruni would be a household name.

Which may explain his eagerness to hop onto the IL2 bandwagon. If the drug lives up to its early promise, Bruni's troubles will be over in a hurry.

Interleukin-2 is an immune system stimulant that occurs naturally in the body. A genetically engineered version is sold by the Chiron Corp., $400 for a small vial. Since its discovery in 1976, IL2 has been used to treat certain types of kidney cancer, but it has also been noted to promote the growth of T-cells, which attracted the interest of the HIV community.

HIV researchers have been playing around with IL2 since the mid-'80s. The drug found its way onto the underground market, and in 1990 Bruni directed some of his patients to a D.C. buyers' club, where they could purchase vials of the drug that had been smuggled in from Ireland or Germany. The patients would divide the drug and inject themselves with small doses, but when Bruni saw no real improvement in them, he lost interest.

The main problem with IL2 is that its side effects nearly outweigh its benefits. The *Physician's Desk Reference*, a manual of drugs and their side effects, warns that IL2 should not be given outside of a hospital, at least not at the near-lethal doses used to treat cancer.

In 1993, researchers at NIH began administering IL2 to HIV patients in much lower doses, dripping it into a vein over the course of four or five days. Bruni heard about the NIH study from patients who were enrolled in it, and in January 1993 he began to offer it to his patients as well. NIH was giving IL2 to patients in residence at its clinic, who were constantly monitored. Bruni did it on an outpatient basis, but at the same dosages used by NIH. He started giving 18 million IUs per day, which is the number on the prescription form in his ads and which NIH researchers described as "the maximal tolerated dose." (NIH has since lowered its dosage to about 6 million IUs. Bruni has followed suit.)

But Bruni's use of IL2 in the outpatient setting worries some doctors. "It is a research tool," says his former employer Caceres. "It is a very

LMB00054

dangerous drug."

IL2's side effects can be horrible—"Imagine the worst flu you've ever had in your life, times five," says one participant in the NIH study—and other physicians who like the drug think it must be used cautiously. "I'm a big fan of IL2," says Dr. Douglas Ward, one of the only D.C. doctors (besides Bruni) who prescribes IL2 to HIV-positive patients. "[But] I really swallow hard every time I prescribe it for someone."

While Ward has given IL2 to only a handful of patients, Bruni says he has prescribed it to 140 patients, some from as far away as Texas and California. Bruni's ads have stopped running, since he can no longer pay for them, but the calls keep coming from patients who want it. (His own partner, Whaley, hasn't taken IL2. "I'm in denial," Whaley says.)

What NIH found—and Bruni is finding, too—is that IL2 seems to raise the T-cell counts of patients who are still relatively healthy. In patients below 200 T-cells, the drug has no effect or even a negative effect. Some patients on the NIH study saw their cells rocket as high as 2,000—to superhero levels, really. No other drug actually boosts the immunities the way IL2 seems to, cranking T-cells through the roof while bringing the viral load down. Whether the new T-cells are fully functional, and whether the increases are permanent, remains to be seen.

Given IL2's debilitating side effects, that's a fairly important question. "Not many people can afford to be sick for 10 days every two months," says one man who participated in the NIH study.

Another caveat about IL2 is that it doesn't always work. The experience of one patient—call him "Mark"—is alarming. He paid Bruni $2,500 to undergo the IL2 course last summer, starting on a Monday and going until Friday. He spent the week racked by fever, nausea, vomiting, the whole bit. On Saturday morning, he awoke to find himself short of breath, shaking, and so achy he was almost unable to move. He called Bruni's answering service, he says, only to find that they did not know who Bruni was. The answering service passed his call to another doctor, whom he did not know.

Mark's side effects passed, but the drug didn't benefit him. His T-cells failed to improve; they dipped, in fact. Mark left Bruni's practice soon afterward, because he felt Bruni was treating him as a "guinea pig," he says.

Since July, Bruni has faced yet another problem: The Washington Hospital Center has put his hospital privileges on hold. Bruni lacks malpractice insurance, which the hospital requires, because he couldn't

pay the $4,000 premium when it came due in June.

If Mark needed to be hospitalized now, he wouldn't have to go to the emergency room. Another doctor has offered to handle Bruni's hospitalizations for the time being. And Bruni hasn't needed the malpractice insurance yet, or the hospital privileges. His luck, what's left of it, has held.

So far. What Bruni's many disasters have in common—the malpractice case, the Curaflex debacle, the Blue Cross dust-up, the bankruptcy—is how easily they might have been prevented. He could have tested Machesney himself, rather than taking his patient's word for it. He might have read the Curaflex contract a bit more carefully and spotted the obvious time bomb it held. Which might, in turn, have spared him the Blue Cross battle, the dwindling of his practice, the sad trip to bankruptcy court, the eviction, and whatever misfortune strikes next.

But Larry Bruni is not an overly cautious kind of guy. Just ask Mike Menius.

LMB00056

Copyright 1991 Cable News Network, Inc.
All rights reserved
CNN
View Related Topics
Health Works
June 8, 1991
Transcript # 69 - 1

TYPE: Package
SECTION: News
LENGTH: 987 words
BYLINE: ANDREW HOLTZ; DAN RUTZ;

HIGHLIGHT:
Some researchers believe that the HIV virus alone may not be the sole cause of AIDS. A contributing factor may be something called mycoplasma fromantens.

BODY:


HOLTZ: People with AIDS carry a virus called HIV, but some researchers believe HIV may not work alone. Dan Rutz reports.


DAN RUTZ, CNN Health Week: [voice-over] Seven years and billions of dollars are invested in studies based on the assumption that HIV is the sole cause of AIDS. Dr. Shyh Ching Lo at the Armed Forces Institute of Pathology thinks the focus of most researchers is too narrow.


Dr. SHYH CHING LO, Armed Forces Institute of Pathology: I think we should always be open minded, you know, and unless we look for something, otherwise we will not be able to find it.


RUTZ: [voice-over] Scientists cannot explain how HIV devastates the immune system, causes cancer, or destroys individual organs, but Dr. Lo has shown how another infectious agent called mycoplasma fromantens [sp?] can kill.


Dr. LO: In an earlier study, we experimentary, in fact, four of our silverly monkeys with this mycoplasma. For all four of the infected monkeys show significant weight loss and progressive weight loss and died in seven to nine months.


RUTZ: [voice-over] Researchers have been unable to make monkeys sick on HIV. What's more, the virus cannot be found in the human organs destroyed by AIDS, though mycoplasma is often present.


[on camera] Over the last five years, Dr. Lo has been pretty much of a lone voice. A few other scientists are getting involved now, but the Federal government has yet to set up a study with AIDS patients to test his ideas.

LMB00030

[voice-over] Dr. Luke Montilia, the first scientist to identify the virus, later named HIV, agrees with Dr. Lo that there must be more to AIDS than what most researchers claim. Working independently, both men report that HIV alone is not enough to wipe out laboratory cell cultures but, when mycoplasma is added, the cells rapidly die. Since mycoplasma are related to bacteria, antibiotics may be effective. *Dr. Larry Bruni follows Dr. Lo's research carefully and treats many of his patients with antibiotics. Half of them appear to benefit.*

*Dr. LARRY BRUNI: I'm not saying that we see a surge in T-cells in 50 percent of the patients, but there's improvement by some measurable or unmeasurable standard. They, subjectively, feel better, or we can measure something that has gotten better.*

Dr. FAUCI: It may be that, in some people, co-infection with mycoplasma does help up-regulate virus expression but, right now, we don't know whether that's the case, and it is unlikely that it is necessary.

RUTZ: [voice-over] Despite his doubts, the doctor in charge of patient research for the Federal government agrees a formal study with antibiotics would be useful, but it's not at the top of his list.

Dr. FAUCI: Now that this has become, essentially, a cause celebre with all of the publicity about it, it's going to be one of those things that we're almost going to have to do either to debunk it or to prove it.

RUTZ: [voice-over] Dr. Bruni treats for both the virus and mycoplasma. That makes sense to doctors Lo and Montila. They say it's too early in the AIDS mystery to rule out any suspects.

HOLTZ: In Cuba, the government takes a hard line against people with AIDS in an attempt to prevent them from spreading the infection. Dan Rutz has more.

RUTZ: [voice-over] In Cuba, the interests of society prevail over the rights of individuals. That's reflected during May Day and in the Party's public health policy.

Dr. HECTOR TERRY, Cuba Health Ministry: [translator] And we think that patients that have any type of contagious disease always have rights but, at the same time, they have a duty - a basic duty - which is that of protecting their family, their friends, their citizens.

RUTZ: [voice-over] Everyone found to carry the so-called AIDS virus must live in a sanatorium.

Dr. TERRY: [translator] We have the most modern treatment. We have nothing to envy from the therapy of any other country of the world. We have the same medicine.

LMB00031

RUTZ: [voice-over] This one is said to be typical, with good medicine, good accommodations, and good food. Within earshot of their care givers, residents are up beat.

MIRIAM: [translator] All of the workers here love us very much, and they take very good care of us.

RUTZ: [voice-over] In the five years since her diagnosis, Miriam's three children have been raised by their grandmother, though Miriam visits often, she misses living with them.

MIRIAM: [translator] But I also think that they need me more if I'm healthy.

RUTZ: [voice-over] Through mandatory testing of nearly all 10 million Cubans, the government counts just 600 infected. That's a fraction of the rate in the U.S., but Cuba started off with a lower rate in the first place. Critics are not impressed.

Dr. JONATHAN MANN, Harvard School of Public Health: What I would suggest is that the word is out, and that in Cuba everybody knows what's going on and, therefore, if you did think you might be infected, would you put yourself forward in any way, or would you actually try to avoid getting tested?

RONALD BAYER, Ph.D., Columbia University: It really is a medical version of preventive detention. Such an approach really is incompatible with democratic values.

RUTZ: [voice-over] Though public-health policy includes education, Dr. Mann maintains its primary element is fear.

Dr. MANN: Controlling your sexual behavior through fear flies in the face of a lot of what has been learned about what motivates us and what helps us change our behavior.

RUTZ: [voice-over] Until Cuba allows an independent evaluation of the program, debate will continue over whether society is helped or hindered.

[on camera] The same citizens who parade before Fidel Castro on May Day submit to what may be the world's most restrictive AIDS policy. On matters of health and life itself, they celebrate an uncompromising doctrine - the greatest good for the greatest number.

HOLTZ: The Columbia astronauts are floating above it all. Still, they have medicine on their minds.

[voice-over] Coming up on Health Week - doctors in space.

[Commercial break]

LMB00032

The preceding text has been professionally transcribed. However, although the text has been checked against an audio track, in order to meet rigid distribution and transmission deadlines, it has not yet been proofread against videotape.

LOAD-DATE: August 25, 1993
  Document 5 of 5

LMB00033