## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Criminal No.: 06-0018 (RBW)** |
| **LARRY M. BRUNI,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR DOWNWARD DEPARTURE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, opposes the defendant's motion for downward departure. In the plea agreement between the parties, the defense conceded that a sentence within the range of 10 - 16 months "would be a reasonable sentence for defendant Bruni in this case." Plea Agreement at ¶ 3, filed 3/6/06, ECF Document 9. Now the defense asks for a downward departure of 5 levels, arguing that a sentence in Zone A, straight probation, is more appropriate. Defendant's Memorandum in Aid of Sentencing ("Defendant's Memorandum") at 1. The government opposes the defendant's motion and urges the Court to sentence the defendant within the guideline range as calculated by the Federal Sentencing Guidelines.

The defendant asks for a departure from the Federal Sentencing Guidelines making essentially three claims: <u>one</u>, submitting that he had diminished capacity which contributed substantially to the commission of the offense; <u>two</u>, complaining that he was less culpable than others in the offense; and <u>three</u>, suggesting that his "high intelligence and commitment to the medical" profession and the likelihood that he will "significantly contribute to this area if given the opportunity to do so" is a "mitigating factor that the Guidelines may not adequately take into

consideration." Defendant's Memorandum at 25. The government opposes any departure. Each of the arguments is addressed in turn below:

I.  DEFENDANT IS NOT ENTITLED TO A DEPARTURE FOR DIMINISHED CAPACITY

The defendant suggests that he "suffered from diminished mental capacity which contributed to his commission of the offense." Defendant's Memorandum at 19. He cites Section 5K2.13 as a basis for a downward departure. Section 5K2.13 provides that a court may depart downward if a defendant: "1) has committed a non-violent offense, 2) while suffering from 'significantly reduced mental capacity', 3) that was not caused by the voluntary use of other intoxicants, 4) where the defendant's mental capacity 'contributed to the commission of the offense,' 5) so long as the defendant's criminal record does not indicate a need for imprisonment to protect public safety." United States v. Leandre, 132 F.3d 796, 800 (D.C. Cir. 1998) (citing U.S.S.G. §5K2.13). To assert such a defense, the defendant must be able to prove that at the time the crime was committed he was unable to 1) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or 2) control behavior that the defendant knew was wrong. U.S.S.G §5K2.3. In this case, the defendant does not even attempt to carry his burden of proof by offering evidence by a qualified expert opinion. See United States v. Greenfield, 244 F.3d 158, 162 (D.C. Cir. 2001) (downward adjustment denied where defendant's depression was moderate and adequately controlled by medication such that his mental capacity was reduced but not significantly reduced). See also United States v. Frazier, 979 F.2d 1227, 1230 (7th Cir. 1992) (diminished capacity defense denied as neither mental health expert concluded that the defendant suffered from significantly reduced mental capacity when she committed the offenses); United States v. Skodnek, 933 F. Supp. 1108, 1122 (D. Mass. 1996 (expert testimony that psychiatrist suffered from severe cognitive distortion

2

supported a downward departure).

Although the defendant has asserted that he suffers from depression and an anxiety disorder, there is no expert testimony which specifically opines that such conditions left him with a significantly diminished capacity such that at the time of the offense the defendant was unable to differentiate right from wrong, or that he was unable to control behavior which he knew was wrong. Rather, the defendant acknowledged in the statement of offense that not only did he know it was wrong to submit fraudulent claims to Medicare for services not provided, but also that he "recognized the high probability" that this was being done in his name. The defendant's request for a departure fails on the basis of diminished capacity as he does not meet the requirements set forth in U.S.S.G 5K2.13 or relevant case law.

Further, the defendant asserts that his diminished capacity resulted from the effects of the prescription medications he was taking at the time of the offense. His argument seems to be that his mind was too diminished to realize that he was bringing in more money than he legitimately could bill Medicare, *but* not too diminished to diagnose and treat complex medical issues in his patients.[1] This claim is an example of the defendant attempting to excuse his conduct with unsupported arguments that deny full responsibility for his crime. No downward departure is justified based on the claim of diminished capacity.

---

[1] In this respect, Dr. Bruni is similar to the defendant in the unpublished opinion cited by the defense. The defense cites United States v. Hampton, 119 F.3d 7 1997 WL 407858 (9th Cir. 1997). In that case the court did not downwardly depart, partly because, as the defense admits, the defendant's "testimony indicated that even while on medication, he was able to function well in operating a sales business." Defendant's Sentencing Memorandum at 23.

II. <u>DEFENDANT IS NOT ENTITLED TO A FURTHER REDUCTION FOR ROLE IN OFFENSE</u>

The defendant argues that his conduct "is far less egregious than the conduct of Messrs. Whaley and Chesnick." Defendant's Memorandum at 26. He urges the Court to look at the "real conduct" and consider that he was "not involved in the planning or execution of the offense." <u>Id</u>. In fact, however, the defendant has already received a downward adjustment because of his reduced role. The government agreed, and the Probation Officer concurred, that the defendant's offense level should be reduced by two levels because of the mitigating role (minor participant) in the offense. <u>See</u> Plea Agreement at ¶3; Presentence Investigative Report at ¶28; U.S.S.G. Section 3B1.2(b). Thus, the defendant has already received the benefit of this argument and his sentence has already been significantly altered because of this reduction.[2]

The defense uses his "role in the offense" and "real conduct" argument as a springboard to complain about the government's investigation into this Medicare fraud scheme. Arguing that the "actual perpetrators" remain at large, the defense suggests that the government wasted an opportunity to "prevent the real criminals from perpetrating the same scheme again." Defendant's Memorandum at 5, footnote 2. The defendant states that he "provided significant cooperation by turning over to the Government a hard-drive," and offered assistance "to the Government in determining the persons actually responsible for devising the fraudulent scheme." Defendant's Memorandum at 4.

Contrary to his assertions, it is the defendant who is the "real criminal." Dr. Larry M. Bruni was the one with the special relationship with Medicare, the doctor whom Medicare trusted and paid to provide medical services to the elderly and disabled. It was Dr. Larry M. Bruni who told the agent

---

[2]Without this two-level reduction, the defendant's offense level would be 14, corresponding to Zone D, 15 to 21 months incarceration, with a minimum of 15 months in jail.

4

that all of his medical records were on the hard drive. Far from voluntarily "turning over"the computer "hard drive" (Defendant's Sentencing Memorandum at 4), the defendant refused to relinquish the hard drive when asked by the agent.[3]  It was Dr. Larry M. Bruni who told his dogs to "sic" the agent when she came to execute a court-authorized search warrant for the hard drive, which later, forensic experts determined to be intentionally destroyed.[4]  The "real criminal" will not perpetrate the same scheme again, because the "real criminal" has been barred from Medicare as a provider.  Without that special relationship with Medicare, Dr. Larry M. Bruni will not be able to bill Medicare again as a medical provider.[5]

Any attempts to shove off responsibility onto his partner fails.  The defendant was on notice that he could not rely upon others, including his partner, to appropriately handle the financial aspects of his, Dr. Bruni's, medical practice.  In his sentencing memorandum, the defendant posits the job of preparing his own tax returns on Gary Whaley.  Defendant's Sentencing Memorandum at 8.  The defendant knew that he was to file tax returns, yet none were filed.  See, Attachment A, Certification

---

[3] The defense makes it appear that the government acted precipitously when it requested a search warrant for the hard drive.  Defendant's Memorandum at 4.  ("The Government did not inform Mr. Bruni's attorney, Mr. Siegel, of the search beforehand and carried out the search after a meeting had been scheduled between the AUSA and Mr. Siegel.").  In reality, the agent requested the hard drive and the defendant refused.  When sought by the prosecutor, the defense attorney also refused.  The government then applied to the court for a search warrant.

[4]The defendant also merely agreed "to tell the truth" if asked about his partner, Gary Whaley, no more than he would required to do if subpoenaed to testify. He was unwilling to conduct covert assignments.

[5]Once the defendant realized that claims had been submitted to Medicare bearing his name and Medicare issued unique identifier and that he had been reimbursed for services not rendered, at no point did he contact Medicare to advise them of the matter.  Therefore, one could only conclude that he acquiesced to the fraud scheme.

from the IRS as to lack of record for federal tax returns for years 2001, 2002, 2003. Failure to pay

his own taxes, and then claiming that it was his partner's responsibility, is another example of the

defendant failing to take responsibility for his own actions and inactions.

Furthermore, the defendant himself, in his sentencing memorandum, provides information

about a previous scheme whereby he allowed another to bill for services that he, Dr. Bruni, had not

provided. As set forth in some detail in the defendant's Exhibit B (page 13 of 23), the defendant

entered into an agreement with a infusion company called Curaflex. Defendant's Sentencing

Memorandum, Exhibit B part 2, at 13 of 23 (reproduction of a 1995 article in *Washington City

Paper*). According to this article (based on the defendant's interview with the reporter), the

defendant agreed with Curaflex that Curaflex would bill the insurance companies using the

defendant's name. Id. According to the article, Curaflex billed "thousands of dollars for services"

for a variety of services that the defendant had not provided, including billing Blue Cross / Blue

Shield for the National Capital Area $656.17 for a 100 m.l. bottle of saltwater. The defendant claims

that this billing practice lead to his claims being denied by various insurers. Id. [6] Thus, years before

the relevant time period in the instant case, the defendant was on notice that he should have greater

oversight of the bills being submitted in his name. The defendant cannot deny his own role and

---

[6]The government's information about the defendant's relationship with Curaflex is consistent in many respects with the article proffered by the defense. In 1994, Office of Personnel Management's Office of Inspector General investigated the Curaflex/Bruni billing scheme. According to the government's investigation, the defendant signed an agreement with Curaflex in 1992, whereby Curaflex would bill under Dr. Larry M. Bruni's name (Gary Whaley negotiated the agreement). In submitting the bills, Curaflex tricked a health care insurer into believing that Bruni was providing services. Bruni received the money and agreed to share the proceeds with Cureflex. After paying about $600,000, the insurer discovered the fraud. Thereafter, Bruni kept Curaflex's share of the money and Curaflex sued Bruni.

responsibility in this Medicare fraud scheme. No other further reductions for minimal participant are appropriate for this defendant.

III.  <u>DEFENDANT IS NOT ENTITLED TO DEPARTURE DUE TO EDUCATION</u>

The defense memorandum devotes 46 pages touting the career of Dr. Bruni.  See Defendant's Sentencing Memorandum at 5-6 and 24-25; Exhibit B Part 1 (21 pages) and Part 2 (23 pages).  In asking the Court to consider "other factors specific to this case pursuant to 18 U.S.C. §3553" (Defendant's Sentencing Memorandum at 24), the defense presents a string of Dr. Bruni propaganda. Defendant's Sentencing Memorandum at 24.  Ending the litany of self-promotion, the defendant concludes with a plea of leniency:

> Given Mr. Bruni's high intelligence and commitment to the medical professional [sic], he is likely to significantly contribute to this area if given the opportunity to do so.  *This is a mitigating factor that the Guidelines may not adequately take into consideration.*

Defendant's Sentencing Memorandum at 25 (emphasis added, citation omitted).

First, the Sentencing Commission <u>did</u> consider whether to include some of these factors in the calculus of creating a fair sentencing guideline structure, and rejected them as relevant or ordinarily relevant. (<u>See</u>, <u>e.g.</u> U.S.S.G. Section 5H1.2 (education and vocational skills not ordinarily relevant); Section 5H1.5 (employment record not ordinarily relevant);5H1.10 (various factors including socio-economic status are not relevant).

Second, whatever contributions the defendant made to the medical profession (a question in debate), by his own literature and sentencing memorandum, he has not been contributing cutting-edge medicine for some years.  Exhibit B is filled with glowing remarks about the defendant, most from the 1980's and 1990's, none from the last five years.  It is questionable whether the defendant could (given his physical condition) or should (given his reliance upon a cocktail of drugs) continue

to treat patients or research AIDS.

Third, and independent from the first two reasons, the government takes issue with the defense suggestion that a two-tiered sentencing system should be erected; one sentence, more lenient, for "highly intelligent" defendants who can "contribute" (Defendant's Sentencing Memorandum at 25), because they have had the advantages of education and opportunity; and a second, stiffer, sentence for those defendants who cannot "contribute," who are not "intelligent," have not gone to medical school, who have not had the advantages of opportunity and education. This kind of disparate results, where the privileged are given probation and the poor are given prison, was one reason for the Federal Sentencing Guidelines.  The defendant should not be rewarded because he squandered his opportunities and turned his medical degree into a license to steal.  The fact that at one time Dr. Bruni (may) have been a successful and accomplished doctor is not relevant to the Court's decision on the appropriate sentence.

<u>CONCLUSION</u>

In his sentencing memorandum, the defendant demonstrated the government's observation set forth earlier – that the defendant is an inordinately proud man.  Dr. Larry M. Bruni seems to believe that he is indispensable to the world of AIDS medicine, that he deserves special treatment because he is "highly intelligent" and can "significantly contribute" to the area of medicine, that he can deflect responsibility of his duty owed to Medicare.  The defendant is wrong.  The government urges the Court to deny the defendant's motions for downward departure and sentence the defendant within the range as calculated by the Federal Sentencing Guidelines in order "to provide just punishment for the offense. . . to afford adequate deterrence

to criminal conduct, and to protect the public from further crimes of the defendant."

18 U.S.C. § 3553(a)(2)(A) - ( C).

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
for the District of Columbia


By:    _____
VIRGINIA CHEATHAM
Assistant United States Attorney
D.C. Bar # 411980
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-9732